# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

TERRANCE JONES                                              CIVIL ACTION

VERSUS                                                      NO. 06-939

N. BURL CAIN, WARDEN                                        SECTION "C" (6)


## ORDER AND REASONS

This matter is before the Court on a petition for writ of habeas corpus by Terrance Jones,

filed *pro se*, seeking relief pursuant to 28 U.S.C. § 2254.  The petitioner raises four claims for

relief from his November, 2001 conviction of one count of second degree murder.  In response,

the State initially argued that the instant petition was untimely filed under 28 U.S.C. §§

2254(d)(1)(A) and 2244(d)(2), and did not respond to the merits of the petition.  Rec. Doc. 4.   In

a supplemental response to the petition, the state argued that his fourth claim was not exhausted

as required.  Rec. Doc. 7.  However, the Court determined that the petition was indeed timely

filed, and that all of his claims were exhausted, and ordered that the state respond to the merits of

the petition, on January 15, 2008.  Rec. Doc. 11.  The state has now responded.  Rec. Doc. 14.

Having thoroughly considered the petition, record, memoranda of parties, and the law, the Court

has determined that this matter may be disposed of without a hearing, and that the petitioner's

habeas corpus petition has merit.  For the reasons set forth below, this petition for relief is GRANTED.

## I. BACKGROUND

In its initial order directing the state to respond to the merits of the petition, the Court reviewed the background and procedural history of this case, and found that petitioner was "in custody" as required for this Court's review, that venue was proper, that all claims were exhausted in the state courts, and that the petition was timely under the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104-132 Apr. 24, 1996, 110 Stat. 1214. Rec. Doc. 11.

The following facts are taken from the Statement of Facts of the Louisiana Court of Appeal, Fifth Circuit:

> Deputy Rene Pinac of the Jefferson Parish Sheriff's Office testified that he was on patrol at about 1:00 a.m. on July 28, 1997, when he received a call regarding a shooting at 7423 Fourth Street in Marrero. The victim was reported to be lying inside of a car. When he arrived at the scene, Deputy Pinac saw a blue Oldsmobile automobile in the parking lot of the Westbank Boat Supply Company, a business adjacent to the residence. The victim, Marty Martin (Martin), was lying motionless inside the car, his left leg hanging out of the open driver's side door. Deputy Pinac testified the victim appeared lifeless. Deputy Pinac called EMS. When EMS technicians arrived, they examined the victim, and found he had no vital signs.
>
> Dr. Fraser Mackenzie was the forensic pathologist who performed the autopsy on the victim's body. He determined the cause of death was a gunshot wound that perforated the heart, lungs, and aorta. In his opinion, the victim would have bled to death within three to five minutes. The doctor testified that toxicology screenings revealed the victim had cocaine, amphetamines, and alcohol in his system. Sandra Barrette, Martin's mother, testified that her son had struggled with a cocaine addiction for several years.

James Artberry (Artberry), who lived at 7423 Fourth Street, approached Deputy Pinac and said he had witnessed the shooting. He gave the deputy a description of the perpetrator and his car. Deputy Pinac broadcast the information over the police radio. He then placed Artberry in the back of his police vehicle. Artberry was transported to the criminal investigations bureau of the sheriff's office, where homicide Detective Mike Tucker and Lieutenant Ralph Sacks questioned him.

Detective Tucker testified that he obtained a total of four statements from Artberry. Three of them were tape-recorded, and were admitted at trial. Those recordings were transcribed. The tapes were played for the jury at trial. The first interview was conducted at 3:18 a.m. on July 28, 1997. Artberry stated he had witnessed a shooting that night. He said he knew the victim casually for more than two years, and that he knew the man was a crack cocaine user.

Artberry in his statement said he encountered Martin on the night of July 27, 1997 at The Happy Hour Lounge, located at Fourth and Jung Streets. Artberry entered the bar at about 10:15 p.m. Martin arrived at about 10:35 p.m., and shortly thereafter, he asked Artberry to help him find a prostitute. Artberry agreed, and went to Martin's car with him. The car was a light blue Oldsmobile or Buick. They were unsuccessful in locating a prostitute, and Martin drove Artberry back to the Happy Hour. Artberry walked home from there.

Artberry in his statement said he saw two unknown African-American men in a blue Pontiac Grand Prix park in front of his house. The car had tinted windows, and a yellow sticker on the back window, indicating a lack of insurance coverage. Artberry went inside his house, and watched the men through a window. The victim drove up the street at a high rate of speed, and parked in front of the house. Artberry opened his door, and saw that the victim was standing next to the Grand Prix, talking to its occupants through the open passenger side window. The driver of the Grand Prix exited the vehicle. Martin walked back to his own car, opened the door and reached inside. He then stood up and put his hand into his pocket as if he were searching for something. Artberry believed the men were engaging in a drug deal.

The driver of the Grand Prix fired two shots, striking Martin. The shooter was two to three feet away from the victim. The victim got into his car and lay down. The shooter fled the scene in his own car. Artberry said his brother came outside after the shots were fired, and Artberry instructed him to call police. Artberry told Tucker he did not get a good look at the shooter's face due to poor lighting in the area, and that he did not recognize the passenger in the shooter's car.

Artberry gave a second recorded statement at the Criminal Investigations Bureau at 4:08 a.m. on July 28, 1997. Artberry confessed that he had failed to disclose some pertinent information during the first interview because he was frightened of recrimination by the perpetrator. He had actually been involved as an intermediary in a drug deal gone wrong. He told the officers that the victim stopped him and said he was looking for some dope. Artberry thought he knew where the victim could purchase drugs, and he took him to Jung Street, near Fourth Street. They met with a woman whose name Artberry did not know. Artberry told the woman what Martin wanted. She in turn flagged down the blue Grand Prix. She told the car's occupants that Martin wanted drugs, and Martin followed the men in his car. Martin and the two African-American men met outside of Artberry's house.

Artberry in his statement stated that he saw the victim approach the passenger window of the Grand Prix. The passenger gave Martin a rock of crack cocaine, and Martin gave him money. Artberry heard the passenger say that Martin had only given him one dollar, and that Martin owed him twenty dollars. Martin searched his pockets, then went to his car and rummaged inside. The passenger told the driver to take his f---ing head off. The driver approached Martin with a gun. The driver told Artberry he faulted him for the deal's unsatisfactory outcome, and then he shot Martin twice. Martin turned and sat in his car. Artberry, fearing he would also be shot, went into his house.

During the second interview, Artberry identified the shooter as an African-American male name Terrence. He told the officers that Terrence lived on Poe Street in Westwego. Artberry said he had known Terrence for a couple of years, and that he was certain he was the perpetrator.

Based on the information he gathered, Detective Tucker composed a photographic lineup. He presented the lineup to Artberry, who was unable to identify any of the subjects. Detective Tucker then compiled a second photographic lineup. He presented the lineup to Artberry, and Artberry identified photograph number four, Terrence Jones, as the man who shot Marty Martin.

After Artberry's identification of defendant from the second lineup, Detectives Tucker and Sacks interviewed Artberry a third time. The interview took place at Artberry's home, 7409 Fourth Street, on July 29, 1997, at 9:03 p.m. Artberry again stated that he saw Terrence fire shots at Martin. He said he witnessed the incident from a distance of 20 to 25 feet. He said he knew Terrence as a drug dealer. He again stated that Terrence fired two shots at the victim. Terrence then

ran to his car, turned to point at Artberry in a threatening manner, and fled the scene.

James Artberry was deceased at the time of trial. The trial judge admitted the sworn testimony Artberry gave at an April 9, 1998 motion hearing under the "unavailable witness" exception to the hearsay rule. Artberry's prior testimony revealed that he witnessed a homicide next to his home at 1:17 a.m. on July 28, 1997. He further testified that he was able to identify the perpetrator in a photographic lineup, and that the perpetrator's name was Terrence. Artberry identified defendant in court as the same person he identified in the photographic lineup. He said he knew defendant for four or five years prior to the murder.

Gelandra Brue testified at trial that, during 1997, she lived on Jung Street in Marrero, about two blocks from Fourth Street. At one time, she worked as a prostitute. She also testified that she sometimes gives away drugs, but does not sell them. She sometimes gave drugs to James Artberry.

During the night and early morning of July 27-28, 1997, Brue was at her home. A white man came to her house and said he wanted to buy a "twenty," a twenty-dollar piece of crack cocaine. Brue did not know the man, although she had seen him earlier that evening. She told him she was not selling drugs, and he left. Ms. Brue surmised that someone had told the man she knew where to get crack. She did not want to deal with the man, however, as she suspected he was an undercover police officer. Some time between 1:00 and 2:00 a.m., a man whom she knew as James arrived at her house accompanied by the white man. James asked whether she knew where to get a "twenty." She told him, "around the corner." Ms. Brue walked around the corner, and James and his companion followed in a car driven by the white man. She went to a house a block away to find an individual whom she knew would have narcotics. This person was not at home, so she returned to her house. Defendant, whom Ms. Brue had known for a year, arrived in a blue Grand Prix. Another man was in the car with defendant.

Ms. Brue stood in her doorway, and defendant and James talked for 10 minutes. The men then left her house. The white man drove away in his car, followed by defendant and his companion. They headed toward Fourth Street, in the direction of James' house.

On the night of July 29, 1997, Detective Tucker showed Ms. Brue the two photographic lineups. She was unable to identify anyone from the first lineup, but identified defendant from the second lineup as one of the men she had seen that night. Upon completing the identification procedure, Detective Tucker

interviewed Ms. Brue. The interview was tape-recorded and played at trial. [*See* below, note 30]  She told Detective Tucker she knew the man in the photograph as Terrence, a drug dealer who lived in her neighborhood. Terrence sold drugs in her driveway on a daily basis. She told the detective that Terrence had been at her house the night before, in his blue Grand Prix. Ms. Brue described how James and his white companion had come to her house in search of crack cocaine. She told the detective that when Terrence arrived at her house, James and his companion left with him. She had not seen Terrence since then.

Mary Gums testified that, at the time of the murder, defendant was living with her on Poe Street. She heard that a man was killed on Fourth Street, just two or three blocks away from her home. She later learned that defendant was wanted for the murder. Police searched her house pursuant to a warrant. Defendant telephoned her and asked her to give his lawyer's telephone number to a "witness" who lived next door to the murder scene. Defendant wanted this witness to call the lawyer. Ms. Gums complied with defendant's request. Ms. Gums pled guilty to accessory after the fact to second-degree murder.

Defendant gave a recorded statement to police at the time of his arrest on October 26, 1997. The tape recording was played for the jury. Defendant told Detective Tucker that, on July 28, 1997, he was in Amite, Louisiana, visiting relatives. He returned home between 5:00 and 6:00 p.m. on July 28, 1997. He left his car, a Pontiac Grand Prix, at home, because it was not running well. He told the detective that the car had tinted windows and a yellow insurance citation sticker. When asked where he had been living until the time of his arrest, he responded, "No permanent place."

*State v. Jones*, No. 2002-KA-908, (La.App. 1 Cir. 4/2/2003), 841 So.2d 965, 969-72.

## II. STANDARD OF REVIEW AND PROCEDURAL HISTORY

### A. *Standard of Review*

AEDPA revised 28 U.S.C.§ 2254(d)(1) and (2), furnishing new standards of review for

questions of fact, questions of law, and mixed questions of law and fact for habeas petitions.

The statute now provides that if a state court has adjudicated a claim on the merits, pure

questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1).

*Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Questions of fact are reviewed under 28

U.S.C. § 2254(d)(2). *Id.*

Regarding questions of law and mixed questions of law and fact, a federal court must

defer to the state court's decision unless it was "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States." 28 U.S.C. § 254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have
> independent meaning. A federal habeas court may issue the writ under the
> "contrary to" clause if the state court applies a rule different from the
> governing law set forth in our cases, or if it decides a case differently than
> we have done on a set of materially indistinguishable facts. The court may
> grant relief under the "unreasonable application" clause if the state court
> correctly identifies the governing legal principle from our decisions but
> unreasonably applies it to the facts of the particular case. The focus of the
> latter inquiry is on whether the state court's application of clearly
> established federal law is objectively unreasonable, and . . . an
> unreasonable application is different from an incorrect one. *Bell v. Cone*,
> 535 U.S. 685, 694 (2002) (internal citations omitted).

As to questions of fact, a state court's factual findings are presumed to be correct and a

federal court "will give deference to the state court's decision unless it was based on an

unreasonable determination of the facts in light of the evidence presented in the state court

proceeding." *Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

In his petition, Jones raises the following claims for relief:

1.    The state failed to disclose *Brady* material in violation of his rights to due

      process.

2.      Petitioner was denied effective assistance of counsel when his counsel failed to call as a witness Nathan Artberry, and when counsel failed to appeal the trial court's ruling denying his motion to quash the indictment

3.      Petitioner was deprived of his Sixth Amendment right to confrontation when out-of-court testimonial statements of a deceased witness were admitted against him at trial.

4.      Petitioner's conviction was obtained in violation of the federal constitution due to an accumulation of errors committed prior to and during trial

## B. Trials and Procedural History

The procedural history of this case is complex, and for a full consideration of petitioner's claims, it bears presentation in detail:

Petitioner was indicted with the first degree murder of Marty Martin on December 11, 1997 in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, Louisiana. State Rec. Vol. 6 at 46-47. The state amended the indictment to second degree murder on July 17, 2000. *Id*; State Rec. Vol. 8 at 545-49. His original trial began the next day.

Prior to trial, the defendant moved to suppress the admission at trial of the testimony of an eye-witness given at a hearing on a motion to suppress his identification of the defendant. *Id.* at 494-515.[1] The witness, James Artberry, had died shortly after the hearing and prior to trial. *Id.* at 498. The trial court denied the motion on the grounds that such testimony would be admissible at trial under the hearsay exception for the former testimony of an unavailable

---

[1] This hearing was held on April 9, 1998.

declarant, LA.C.E. Art. 804(B)(1).  *Id.* at 511-12; *State v. Jones*, 00-KK-2837 (La. 6/29/01) ,791

So.2d 622, 624.   Petitioner's subsequent pre-trial writs on this issue were denied by the

Louisiana Fifth Circuit, *State v. Jones*, 00-K-1286 (La.App.5 Cir. 7/14/00), and Supreme Court.

*State v. Jones*, 00-KK-2155 (La. 7/18/00), 766 So.2d 1261.[2]  At trial, however, the state, during

its redirect examination of Detective Tucker, showed defense counsel for the first time the two

recorded statements made by Artberry to Tucker on the morning of the victim's death.  *Jones*,

791 So.2d at 624.

> Defense counsel immediately moved for a mistrial on grounds that the state had
> not disclosed either statement before the hearing on respondent's motion to
> suppress Artberry's identification. After conducting a hearing outside of the jury's
> presence, the trial court found that, in fact, the state had not disclosed the
> statements before the suppression hearing despite a defense discovery request and
> despite the claim of the prosecutrix that she had provided counsel with open file
> discovery.

*Id.*; State Rec. Vol. 8 at 550-80, Hearing trans.  In the first of the two statements,[3] taken at 3:18

a.m. on July 28, 1997, the morning after the shooting, Artberry states that he is unable to identify

the shooter.  State Rec. Vol. 11.  In the second, taken at 4:08 a.m. on the same morning,[4]

---

[2] The state indicated in its original response that copies of these writs were not available from the Supreme
Court due to Hurricane Katrina and that it provided this Court with a copy of what it had in its file.  Their absence
does not prevent the Court from fully analyzing the issues in this case and reaching its ruling.

[3] The Louisiana Fifth Circuit, in its opinion on direct review, describes a third statement given by Artberry
to Detectives Tucker and Lieutenant Ralph Sacks at his home, on July 29, 1997, at 9:30 p.m.  *Jones*, 841 So.2d at
971.  A tape of this statement was played for the jury at his second trial, immediately after the first and second
statements.  State Rec. Vol. 9 at 810-11; Tr. trans. 185-86.  The tape and the transcript of the third statement were
admitted as State Exhibits Nos. 39 and 43, respectively.  *Id.*; *see also* List of Exhibits Admitted at Trial, State Rec.
Vol. 8 at 628; Tr. trans at 3.  Although numerous copies of the transcripts of the first two statements are present in
the state record filed in this Court, *see* State Rec. Vols. 3, 5, 11, 12, the Court can find no copies of the transcript of
the third.

[4] The heading of the transcript of this statement indicates it was taken at 4:08 p.m. on July 28, 1997, which
appears to be a typographical error.  The background summary provided immediately thereafter on the first page of
the transcript indicates it begins at approximately 4:08 a.m.  In addition, Detective Tucker asks, after Artberry gives

Artberry told Tucker that he was hiding certain information in the first statement because he was

scared, and reveals his participation in the drug transaction and the name and address of Jones as

the man who shot the victim, among other details. *Id.*[5]

In a strongly worded ruling, the trial court reversed its ruling admitting the transcript of

Artberry's testimony for the purposes of the trial, and granted Jones' motion for mistrial. State

Rec. Vol. 8 at 577-79. The state then sought review in the court of appeal of the trial court's

ruling barring the admission of the hearing testimony. The state court of appeals upheld the trial

court's ruling because "the defense did not have an opportunity to fully and effectively cross-

examine the now unavailable witness, a necessary condition for admissibility of the former

testimony." *Jones*, 791 So.2d at 624 (quoting *State v. Jones*, 00-1432 (La.App. 5 Cir. 9/13/00)).

---

his name, "Okay is this indeed the second taped statement that I've taken from you this morning?" State Rec. Vol. 11, Transcript at 1 of 8. Both the Louisiana Fifth Circuit and Supreme Court also described Artberry's second statement as being taken in the morning.

[5] The Louisiana Supreme Court summarized the contents of the two statements as follows:

[Artberry] made the statements at issue to Jefferson Parish Deputy Sheriff Michael Tucker on the morning of July 28, 1997, shortly after the victim's death. In his first statement, Artberry gave a skeleton outline of his activities earlier that night and claimed that while the shooting had taken place outside of his apartment as he stood on his front porch witnessing the events, he did not get a "good look" at the assailant because of the poor lighting in the area. In a second statement taken approximately 40 minutes later, after Deputy Tucker turned off his tape recorder and spoke to the witness off the record, Artberry acknowledged that he had been concealing some details about that evening. Artberry revealed that he had acted as an intermediary for the victim in an abortive drug transaction with respondent which was to have taken place outside of Artberry's apartment. Artberry informed Tucker that the drug deal went sour when the victim could not produce $20 for a rock of cocaine and respondent then shot and killed him in the dispute over payment. He also told Tucker that moments before the victim died, respondent turned and "looked at me, he said I fault you for this and then he shot the fellow." Artberry explained at the beginning of this second statement that he "was hiding some facts from the first statement 'cause I was scared.' " Artberry subsequently identified respondent in the second of two photographic lineups conducted by Deputy Tucker.

*Jones*, 791 So.2d at 623.

The Louisiana Supreme Court, however, reversed the lower courts and held that the state's withholding of Artberry's prior statements did not preclude the state from introducing the hearing transcript at trial. *Jones*, 791 So.2d at 627-29. The court reiterated its prior ruling that the exception to the hearsay rule for prior testimony, LA.C.E. art. 804(B)(1) (as would its federal counterpart), allowed the admission of the suppression hearing testimony at trial, because Jones had a similar motive to develop Artberry's testimony by cross-examination. *Id.* at 624-25. The admission of the testimony would not violate Jones' right to confrontation under the Sixth Amendment and parallel Louisiana constitutional provision, because Art. 804(B)(1) incorporates a firmly-rooted exception to the hearsay rule under the test set out in *Ohio v. Roberts*, 448 U.S. 56 (1980). *Id.* at 625.

The subsequent revelation of Artberry's prior statements did not change the court's view of the admissibility at trial of his hearing testimony: the trial court had allowed defense counsel to confront and cross-examine Artberry and question him extensively as to his ability to perceive accurately and recall the events of the evening at issue, giving him a free hand under *Manson v. Braithwaite* to determine the admissibility of identification testimony at trial. 432 U.S. 98 (1977). *Id.* at 626. While the defense may have found it useful to explore discrepancies between Artberry's testimony and his undisclosed prior statements, the state had no statutory discovery duty to disclose the pre-trial statements of its witnesses unless they were co-defendants in the case. The court noted that "[t]he state's duty under the Due Process Clause to disclose material exculpatory evidence protects the defendant's right to a fundamentally fair *trial*, [*United States v. Bagley*, 473 U.S. 667, 678 (1985)], not the defendant's right to prepare for

an evidentiary hearing which in this case occurred a full two years before trial. [*Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995)]." *Jones*, 791 So.2d at 626 (emphasis in original; some citation and parentheticals omitted).

The court reasoned that although the defense might have conducted a different and perhaps more effective cross-examination of Artberry if it had possessed the witness's prior statements, the state's failure to disclose those statements did not render the hearing testimony inadmissible under the confrontation clause; the Sixth Amendment "guarantees only an *opportunity* for cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defendant might wish." *Id.* at 626-27 (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)).

The court noted that LA.C.E. art. 806 provided an important safeguard for the defendant,[6] stating that "[a]t trial, the defense may therefore introduce one or both of Artberry's statements as it sees fit to acquaint jurors with all of the circumstances surrounding the witness's identification of respondent and thereby allow them to reach a reliable determination as to the accuracy of the identification." *Id.* at 628. The court concluded:

> Jurors will not have benefit of " 'a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the

---

[6] Art. 806 is substantially based on its federal counterpart, and provides that "[w]hen a hearsay statement, or a statement defined in Article 801(D)(2)(c) or (D)(3), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, offered to attack the declarant's credibility, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as a witness identified with an adverse party."

recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " [*Roberts,* 448 U.S. at 63-64, 100 S.Ct. at 2538 (quoting *Mattox v. United States,* 156 U.S. 237, 242-43 (1895).]  However, the loss of this aspect of the Confrontation Clause in the present case stems not from the state's withholding of Artberry's statements before the suppression hearing but from the unexpected death of the witness before respondent's first trial. Even assuming that counsel had thoroughly cross-examined Artberry at the suppression hearing about his prior statements, no jury in this case would ever have had the benefit of viewing Artberry's demeanor as counsel questioned him with regard to the extent of his self-contradiction or motive and bias in the case. The state's failure to disclose Artberry's prior statements promptly therefore has no bearing on the necessity arising from the witness's untimely death that jurors must determine the reliability of Artberry's identification on the basis of the cold record of his testimony at the suppression hearing, as tested by counsel's detailed cross-examination at the time, and as tested by the defense at trial under the provisions of La.C.E. art. 806.

*Id.* at 628-29.

Thereafter, Jones moved to quash the indictment, contending that the state's introduction of Artberry's statements on the third day of trial was intended to provoke the defense into requesting a mistrial, motivated by a fear that the jury was likely to acquit, and that the Double Jeopardy clause barred a second trial.  State Rec. Vol. 7 at 312.  This motion was heard and denied on August 30, 2001, on the grounds that the actions of the prosecutor in withholding the statements prior to trial were not deliberately calculated to force the defense into requesting a mistrial.  State Rec. Vol. 8 at 604, 621-23.  The defense counsel objected and requested time to take writs, but no writs were taken.   Petitioner's second trial began on November 14, 2001.  *Id.* at 626.

At trial, the state introduced the transcript of the April 9, 1998 hearing on the motion to

suppress Arbterry's identification.  State Rec. Vol. 9 at 771; Tr. trans. at 146.[7]  Immediately

thereafter, the state called Detective Tucker to the stand.  *Id.* at 773; Tr. trans. at 148.  After

testifying that he had taken two statements from Tucker that evening, and stating that he

originally stated that he witnessed the murder but could not identify anyone, Tucker began to

testify as to what Artberry said in his second statement.  *Id.* at 779-81; Tr. trans. at 154-156.

Defense counsel immediately objected on hearsay grounds.  *Id.* at 781; Tr. trans. at 156.  At a

bench conference, the state argued that it was not hearsay as it was not offered for its truth, but

rather to show why the detective went to take the second statement.  *Id.* at 782; Tr. trans. at 157.

The court ruled that it would be allowed for the purposes of Tucker relating how he conducted

his investigation.  *Id.*  Defense counsel moved for a mistrial, arguing that while the Louisiana

Supreme Court allowed the hearing testimony because it was cross-examined, the statements

themselves had never been cross-examined.  *Id.* at 783; Tr. trans at 158.  The judge reiterated

that he was allowing the officer's testimony to show what led him to the next step in his

investigation, and not for its truth.  *Id.*  Defense counsel reurged his objection minutes later,

stating that it was an ongoing objection, and that "every word is hearsay at this point."  *Id.* at

788-89; Tr. trans. at 163-64.

     Soon thereafter, the state moved to introduce transcribed copies of the statements and to

play recordings of the statements.  *Id.* at 791-93; Tr. trans. at 166-68.  Defense counsel

requested a hearing on the admission of the taped statements out of the presence of the jury.  *Id.*

---

[7] The defense did not object to the admission, pursuant to Art. 804(B)(1), of the hearing testimony at Jones' second trial, and did not raise the issue on appeal or post-conviction relief in the state court; nor does petitioner raise this issue now.

at 792-93; Tr. trans. at 167-68.  At the hearing that followed, defense counsel stated that he objected to the playing of the tapes on hearsay and confrontation grounds, as he had to the officer's testimony.  *Id.* at 794; Tr. trans. at 169.  He argued that the introduction of the statements, which had not been turned over to the defense prior to the suppression hearing, compounded the violation.  *Id.* at 794-95; Tr. trans. at 169-70.  He objected again, and stated that he moved for a mistrial if the state played the tapes and introduced the statements.  *Id.* at 795; Tr. trans. at 170.

The state argued that the Louisiana Supreme Court had already ruled allowing the admission of the statements, and that they were admissible as either impeachment or under exceptions to the hearsay rule, "which allow the State or any party offering it in which to buttress the credibility of the witness to offer, that those statements are either impeachment or they are prior consistent statements, which are consistent with his testimony at Trial."  *Id.*  The state then argued that throughout the trial, in his opening statement and up until the point of the officer's testimony, defense counsel had referred to the statements "completely."  *Id.* at 795-96; Tr. trans. at 171-72.  The prosecutor then argued that under La.C.E. art. 801(D)(1)(b), prior statements consistent with a witness's testimony offered to rebut an express or implied charge of recent fabrication or improper influence or motive are not hearsay and are admissible.  *Id.* at 799-80; Tr. trans. 174-75.  Defense counsel argued that the article requires that the witness be on the stand at trial and subject to cross-examination on the statement, and noted again that the defense did not even know of the statements at the time of the suppression hearing.  *Id.* at 801-02; Tr. trans. at 176-77.  The trial court then asked defense counsel if he would admit that he at least

inferred to the jury that they could not trust Artberry, and counsel answered affirmatively, because he believed Artberry was a suspect in the case. *Id.* at 803-04; Tr. trans. at 178-79. Defense counsel reiterated that he believed Art. 801(d)(1)(B) did not apply and that he objected to the introduction of the tapes. *Id.* at 804; Tr. trans. at 179. The court overruled the objection and defense counsel moved for a mistrial if the statements were played. *Id.* at 805-07; Tr. trans. at 180-82.

The state then introduced the transcripts, and the tapes were played for the jury. *Id.* at 808-811; Tr. trans. at 183-86. Later in his direct testimony, Detective Tucker testified regarding photographs taken of the victim's body at the scene, and the interior of the car where he was found. He noted that a crumpled twenty-dollar bill was found in the armrest. *Id.* at 835-36; Tr. trans. at 210-11. The prosecutor recalled Tucker's opportunity to interview all of the witnesses, including the statements of Artberry that had already been played. *Id.* at 836; Tr. trans. at 211.

The prosecutor then asked Tucker whether, pursuant to those statements and the money found in the consol itself, he had arrived at any theories as to how the victim was shot. *Id.* He answered: "The theory that I arrived at was that the victim had no intentions on ripping off Terrance Jones, the drug dealer." *Id.* at 212; Tr. trans. at 837. Defense counsel immediately objected that this was speculative and not based on any type of firsthand information. *Id.* In a bench conference, the prosecutor defended the officer's testimony as the theory he had arrived at based on his conclusions that he reached as a result of his investigation, including "his opinion as a Police Investigator, ... that Mr. Martin at the time of the shooting was trying to reach back to obtain the other - turning to obtain the other twenty-dollar bill; because that is what the witness

has alleged, that he gave him a one-dollar bill and not a twenty-dollar bill." *Id.* at 838; Tr. trans. at 213. Defense counsel objected: "This is crazy. He's got to testify from facts. He can't make up a story, and explain that and hand that to the Jury." *Id.* The judge then asked the prosecutor to "[t]ell me what is it that this jury has heard so far that allows him to conclude that a one-dollar bill was not given; first off, not necessarily Terrence Jones." *Id.* at 838-39; Tr. trans. at 213-14. The prosecutor then pointed out that in "that previous testimony on the part of Terrence Artberry (sic)" the victim had stated: "No, I gave you a twenty-dollar bill." *Id.* at 839; Tr. trans. at 214. The prosecutor stated that "I would be happy to show that to you. I don't know if it's in the prior transcript or if it's in the statements, but it is there." *Id.* The prosecutor proceeded to point out pages in Artberry's second statement where Artberry describes an argument between the victim, a passenger, and Jones over whether the victim had handed him a dollar bill instead of a twenty-dollar bill. *Id.* at 840-41; Tr. trans. at 215-16; *see* State Rec. Vol. 11, Second statement of Artberry at 4-5 of 8. The prosecutor then stated: "[W]e're not offering a summary of the evidence whatsoever at all. What we are doing is, we're offering this Officer who was the lead Investigator, his theory." *Id.* at 841; Tr. trans. at 216. Defense counsel questioned, "How do you know that the twenty dollar bill in the car was the twenty-dollar bill they were talking about. There has been not testimony there." *Id.* at 842; Tr. trans. at 217. The prosecutor then explained,

> Judge, I can tell you where it's going to go. [Tucker]'s going to say at this point that at the point that [Martin] was shot, he was turning around to retrieve the twenty-dollar bill; which is consistent with the physical evidence, which is consistent with what the witnesses have testified, which is consistent with what the statements bear out. And therefore, that's what he's going to do.

THE COURT: Artberry says the man went into the car, walked over the car, okay; was followed over to the car basically by the perpetrator. The guy going into the car; does something inside the car and then stands up. And at the moment, interestingly enough, two shots are fired. That's what Artberry said.
[PROSECUTOR]: Yes.
THE COURT: We agreed on that.
[DEFENSE COUNSEL]: Great. If you believe that's true.

*Id.* at 843-44; Tr. trans. at 219. This exchange continued with more argument over the basis for

Tucker's testimony as to his theory. The court ultimately ruled that it would "allow [Tucker] to

testify as to what he discovered, alright; that led him ultimately to conclude that the perpetrator -

the perpetrator is your client; okay." Defense counsel states:

I'm sorry. That is truly objectionable. I would move for a Mistrial. If this non-qualified person can sit here before the Jury and give an opinion as to why my client is guilty at this point, and summarize facts, that is improper. And that is what you're authorizing.
THE COURT: I am not going to allow this witness to tell this Jury what he believed was in the mind of the victim.
...
[DEFENSE COUNSEL]: My objection still stands.
THE COURT: And I'm going to caution the witness.

Id. at 847-848; Tr. trans. at 222-23. The bench conference ended, and the court instructed

Tucker:

[I]n giving your theory, to refrain from speculating as to what might have been in the mind ... of the victim at that time. Or for that matter, what might have been in the mind of anyone else. ... Unless you have some declaration, something in evidence to support your theory. Is that correct? ... Is that understood?

*Id.* at 849; Tr. trans. at 224. The prosecutor then asks:

Detective, I was asking you as far as how the shooting took place. And as far as the physical evidence you found; you did find - did you find the twenty-dollar bill in the car?
A: Yes sir, I did.

18

Q: And you had interviewed the witnesses themselves?
A: Yes sir, I did.
Q: Okay.  Without going into what anybody is thinking, did you have a theory as to how the incident itself, the shooting took place?
A: Yes, sir.
Q: And what was that?
A: While reaching into his vehicle to retrieve the twenty-dollar bill, the victim was shot with his arm extended.  The bullet entering the right side of his chest; dropping both lungs and his heart.

*Id.* at 849-50; Tr. trans. at 224-225.

Jones was convicted.  *Id.* at 878; Tr. trans. at 253.  He appealed to the Louisiana Fifth Circuit, arguing that it was reversible error to permit the state to introduce to the jury the multiple out-of-court statements of Artberry, the sole eye-witness to the shooting, and invoking his right to confront witnesses against him under the Sixth Amendment.  State Rec. Vol. 9, Appellate Brief.  He also argued that the trial court improperly restricted appellant's cross-examination of a key state witness, Mary Gums, about any deal she might have struck with the state.  *Id*.  The court held that the state's argument that Artberry's statements were admissible to explain Tucker's actions lacked merit, but that their admission was supported by Art. 801(d)(1)(B).  *Jones*, 841 So.2d at 973-76.  The court also denied Jones' other claim.  *Id.* at 976-77.   Jones took a writ to the Louisiana Supreme Court on his first issue, that the trial court had erred in allowing the state to introduce the multiple out-of-court statements of Artberry.  State Rec. Vol. 11.  The court denied his writ without opinion.  *State v. Jones*, 2003-0895 (La 9/26/03), 854 So.2d 345.

On September 24, 2004, petitioner filed a post conviction relief application in the trial court, raising four claims: 1) denial of the right to confrontation under the Supreme Court's new

decision in *Crawford v. Washington*; 2) a claim requesting re-submission of his direct appeal

claim regarding the exception to hearsay, in light of *Crawford*; 3) ineffective assistance of

counsel for failure to appeal the trial court's order denying the motion to quash the indictment;

and 4) accumulation of errors. State Rec. Vol. 5. On October 12, 2004, the trial court denied his

third claim on the merits, and denied the fourth claim as procedurally barred because it was

repetitive and on res judicata grounds (as the Louisiana Fifth Circuit had previously reviewed the

record for errors patent and found none). *Id.* The court ordered the state to respond to his first

and second claims, and thereafter denied both on December 21, 2004. *Id.* The court ruled that

*Crawford* was not applicable retroactively to cases on collateral review, and that the Louisiana

Supreme Court had already ruled on his Confrontation Clause claim on direct review. *Id.* The

Louisiana Fifth Circuit and Supreme Court denied his subsequent writ applications on February

3, 2005 and January 27, 2006, respectively. *Id.* The instant petition followed.

### III. PETITIONER'S FIRST, THIRD, AND FOURTH CLAIMS

Petitioner claims that the statements made by the deceased witness, James Artberry, were

withheld by the state and not disclosed to the defense until trial, well after his death, in violation

of his rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that due process requires

the prosecution to disclose evidence favorable to an accused upon request when such evidence is

material to guilt or punishment). In his first statement, Artberry claims that he was not able to

identify the perpetrator and in his second, states that he had lied in the first and could in fact

identify petitioner. Petitioner argues that the statements were relevant and material to his

identification, and had they been made available in a timely manner, there is a "reasonable

probability that it would have changed the outcome of the proceeding or created a reasonable doubt that did not otherwise exist." Rec. Doc. 1 at 28.

While it appears that there was a serious violation of the *Brady* rule at petitioner's first trial because of the state's failure to disclose Artberry's statements, this failure was the grounds for the mistrial ordered by the trial judge. State Rec. Vol. 5 at 579. Artberry's statements, which are the subject of petitioner's Confrontation Clause claim, discussed below, were disclosed and available to the defense well in advance of his second trial. The state courts corrected the error and afforded petitioner the appropriate relief; Petitioner's claim therefore presents no grounds for relief from his ultimate conviction or sentence.

Petitioner raises two claims of ineffective assistance of counsel. He first contends that he was denied effective assistance of counsel at trial because his counsel failed to call Nathan Artberry. He also argues that he was denied effective assistance of counsel during the pretrial procedure due to counsel's failure to appeal the trial court's ruling which denied petitioner's motion to quash the indictment. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate both (1) counsel's performance was deficient *and* (2) that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). "Counsel's

performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). An analysis of an attorney's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *Strickland*, 466 U.S. at 689. "[I]t is necessary to judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* Indeed, the Fifth Circuit has adopted the *Strickland* test holding: "[d]eficient performance is prejudicial only upon a showing that but for counsel's errors, there is a reasonable probability that the ultimate result would have been different and that confidence in the reliability of the verdict is undermined." *Little*, 162 F. 3d at 860-61. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

It is important to note that petitioners bear the burden of proof when asserting a claim for ineffective assistance of counsel. Petitioner "must demonstrate, by a preponderance of the

evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e., deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. *Strickland*, 466 U.S. at 697. Furthermore, a claim of ineffective assistance of counsel is a mixed question of law and fact. *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002), *cert. denied*, 538 U.S. 969 (2003). Therefore, this Court must defer to the state court on these claims unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.§ 2254(d)(1).

Petitioner argues that he was denied a fair trial and irreparably prejudiced by counsel's failure to call Nathan Artberry, James's Artberry's brother, who called 911 to report the incident. He claims that Nathan Artberry would have given a different version of the events in the presence of the jury. "[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have testified are largely speculative." *Buckelew v. U.S.*, 575 F.2d 515, 321 (5th Cir. 1978). In order to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" *Evans v. Cockrell*, 285 F.3d 370, 377 (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). Here, petitioner has produced no evidence as to how Nathan Artberry would have testified or

that his testimony would have been favorable. Petitioner can therefore not show that he was prejudiced by his counsel's failure to call him. Furthermore, the record indicates that defense counsel sought to avoid publication of the contents of Nathan Artberry's statement to the jury, State Rec. Vol. 8 at 697, and objected to a report made of what he had told the police officers when they arrived at the house. *Id.* at 695. It thus appears that counsel's decision not to call Nathan Artberry as a witness was a strategic trial decision that is accorded great deference. See *Strickland*, 466 U.S. at 689.

Petitioner also argues that his counsel was ineffective for failing to appeal the denial of a motion to quash the indictment prior to his second trial. Defense counsel argued at the August 30, 2001 hearing on the motion that the prosecutorial misconduct in failing to provide the defense with Artberry's statements, in violation of Brady, prevented the state from retrying him, under double jeopardy. State Rec. Vol. 8 at 604. The court considered the motion under *Oregon v. Kennedy*, 456 U.S. 667 (1982), in which the Supreme Court stated:

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause ... Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Id.* at 675-76. The judge concluded that while the actions of the state had clearly prompted defense counsel to request a mistrial, it was his opinion that those actions were not deliberately calculated to force him into requesting a mistrial. State Rec. Vol. 8 at 621. The judge appears to have credited the prosecutor's argument that he had not been aware at the time he attempted to

introduce the statements at petitioner's first trial that the prior prosecutor on the case had not disclosed the statements. *Id.* at 613, 622. Defense counsel objected and requested time to take writs on the issue, *id.* at 623, but never did.

In review of petitioner's claim of ineffective assistance of counsel in his application for post-conviction relief, the trial court concluded that petitioner had not demonstrated that defense counsel's failure to seek review of the denial of the motion to quash was so serious as to cause him prejudice and deny him a fair trial. State Rec. Vol. 5. This Court finds that this was not an unreasonable application of *Strickland*. The extensive record of this case reveals numerous motions, writ applications, and appeals filed by defense counsel over the course of petitioner's two trials. It appears in this context that counsel's decision not to ultimately seek writs on this issue was a considered strategic one. The trial court's factual determination that the prosecution's actions did not meet the *Kennedy* standard is well-grounded in the record, and counsel may have considered the chance for success on appeal to be minimal. Petitioner thus fails to meet either the deficient performance or prejudice prongs of the *Strickland* test.

Finally, petitioner claims that he is entitled to relief due to the accumulation of errors committed prior to and during his trial. Several errors taken together can violate a petitioner's right to due process and cause a trial to be fundamentally unfair. *Derden v. McNeel*, 938 F.2d. 605, 610 (5th Cir. 1991) (citing *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir), *cert. denied*, 464 U.S. 951 (1983) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair"). This claim appears to be procedurally barred: the state trial court denied the claim in

petitioner's application for post-conviction relief as "repetitive and res judicata" because the Louisiana Fifth Circuit had "previously reviewed the record for errors patent" and found none. State Rec. Vol. 5; *see Jones*, 841 So.2d at 977. The Court finds no error at all related to petitioner's first and third claims, and as discussed below, that petitioner's Confrontation Clause claim merits relief in its own right. Accordingly, petitioner's claim of accumulation of errors has no merit.

## IV. PETITIONER'S SECOND CLAIM: DEPRIVATION OF RIGHT TO CONFRONTATION AS GUARANTEED BY THE FEDERAL CONSTITUTION

This claim involves significant procedural complexity, vague state court rulings, and strained application of an evidentiary rule that complicates review, all of which the Court finds merit extensive discussion. However, these issues mask what ultimately a very simple case: unconfronted and testimonial out-of-court statements were admitted against petitioner and used for their truth at his trial. This admission violated his Sixth Amendment right to confrontation in a way that surely had a substantial and injurious effect or influence in determining the jury's verdict.

### A. The Sixth Amendment Confrontation Clause

Petitioner Jones contends that he was denied his constitutional right to confrontation when the state introduced at his trial the out-of-court and never confronted testimonial statements of James Artberry, who was then deceased and no longer available to testify or face cross-examination. The Confrontation Clause of the Sixth Amendment guarantees the right of

the accused in a criminal prosecution to confront all witnesses against him. U.S. CONST. amend. VI; *United States v. Acosta*, 475 F.3d 677, 680 (5th Cir. 2007). This bedrock procedural right applies to both federal and state prosecutions. *Crawford v. Washington*, 541 U.S. 36, 42 (2004); *Pointer v. Texas*, 380 U.S. 400, 406 (1965). The Supreme Court has noted the underlying and fundamental goals this right is meant to ensure:

> [T]he right to confront and cross-examine adverse witnesses contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails. To foster such a system, the Constitution provides certain safeguards to promote to the greatest possible degree society's interest in having the accused and accuser engage in an open and even contest in a public trial. The Confrontation Clause advances these goals by ensuring that convictions will not be based on the charges of unseen and unknown-and hence unchallengeable-individuals.

*Lee v. Illinois*, 476 U.S. 530, 540 (1986). The right serves more than just symbolic goals; it is meant to promote reliability in criminal trials through the mechanisms of confrontation and cross-examination. *Id.*

> Confrontation: (1) insures that the witness will give his statements under oath-thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158 (1970) (footnote omitted).

The statements of James Artberry, the only witness who claimed to have witnessed the murder in this case, made to the investigating police officer at the sheriff's office in the early morning after the crime, were played for the jury in their entirety at trial. The statements contained detailed and highly prejudicial assertions about Jones' drug-dealing and about the

nature and depravity of the shooting; they are significantly more detailed in these respects than Artberry's hearing testimony. Defense counsel was not aware of these statements at the time of the hearing such that Artberry was never confronted regarding them, let alone before the jury at the trial itself.

Jones challenged the admission of these statements in his direct appeal, arguing that "[t]o have permitted the introduction of this evidence under the guise of permitting the State to respond to trial counsel's suggestion that perhaps Artberry is the killer, is the worst kind of bootstrapping." State Rec. Vol. 12, Brief of Appellant at 12. The Louisiana Fifth Circuit upheld their admission under the exclusion to the hearsay rule in LA.C.E. Art. 801(d)(1)(B), without discussing the implications of the Confrontation Clause. The Louisiana Supreme Court denied his writ application without opinion. In September, 2004 petitioner filed an application for post-conviction relief. He once again asserted that his Confrontation Clause rights were violated, this time invoking the intervening Supreme Court decision in *Crawford v. Washington*, 541 U.S. 36 (2004).

In *Crawford*, the Court fundamentally altered its understanding of the role of the Confrontation Clause as set forth twenty-four years earlier in *Ohio v. Roberts*, 448 U.S. 56 (1980). *Roberts* had collapsed the Confrontation Clause into the hearsay rules of the Federal Rules of Evidence, holding that statements of unavailable witnesses could be admitted, consistent with the Confrontation Clause, if they were reliable. *See Acosta*, 475 F.3d at 680. In *Crawford*, the Court instead imposed a bright line rule: the Confrontation Clause permits the admission of an out-of-court testimonial statement only where the declarant is unavailable, and

only where the defendant has had a prior opportunity to cross-examine. *Crawford*, 541 U.S. at 59; *see Acosta*, 475 F.3d at 680.

## B. Applicability of Crawford v. Washington

The state correctly points out that *Crawford* may not be applied retroactively to petitioner's case. A federal court reviewing a habeas petition under 28 U.S.C. § 2254(d)(1) must determine whether the state courts adjudicated petitioner's claims according to "clearly established law;" this phrase refers to the holdings of the Supreme Court as of the time of the relevant state court decision. *Williams v. Taylor*, 539 U.S. 362, 412 (2000). Furthermore, in *Whorton v. Bockting*, the Court held that the *Crawford* decision did not announce a "watershed rule" of criminal procedure, and thus it could not be applied retroactively on collateral review. 549 U.S. 406 (2007); 127 S.Ct. 1173. Petitioner's direct appeals ended in late 2003. *Crawford* was not decided until March of 2004, and can not be applied to his case.

However, the fact that *Crawford* is inapplicable to petitioner's claims does not end this Court's analysis. Although *Crawford* fundamentally altered the test under which violations of the Confrontation Clause are considered, it did not birth the right itself. Petitioner properly raised and exhausted his claim that his right to confront witnesses against him were violated in his direct appeal. He then attempted to have his claim addressed again by the state courts under the *Crawford* decision; the state courts have had every opportunity to consider the merits of his constitutional claim. The Court therefore considers his claim under the law as it existed prior to *Crawford*. *See Murillo v. Frank*, 316 F.Supp.2d 744 (E.D.Wis. 2004) (concluding that *Crawford* did not apply retroactively and considering habeas claim under *Roberts* instead); *Tenvaga v.*

*McGrath*, 2007 WL 2572245, *12 (N.D.Cal. 9/5/2007) (citing *Bockting* and applying *Roberts* to claim on collateral view); *Miller v. Fleming*, 225 Appx. 606, 608 (9th Cir. 2007) (same).[8]

### C. Consideration of Petitioner's Claim Under **Ohio v. Roberts**

Under *Ohio v. Roberts*, the out-of-court statements of unavailable witnesses could be admitted, consistent with the Confrontation Clause, if they were shown to bear adequate "indicia of reliability." 448 U.S. at 66. Reliability can be inferred without more where the evidence falls within a "firmly rooted hearsay exception." *Id.* If it does not, the evidence must be excluded absent a showing of "particularized guarantees of trustworthiness." *Id.*

The trial court admitted Artberry's police-house statements at trial purportedly for the non-hearsay purpose of showing Detective Tucker's "course of investigation." While the state appellate court rejected this use, it upheld the admission of the evidence under the exclusion from the hearsay rule in L.A.C.E. art. 801(d)(1)(B). As a preliminary matter, the Confrontation Clause does not bar the use of statements for non-hearsay purposes, that is, for purposes other than establishing the truth of the matter. *See Tennessee v. Street*, 471 US. 409 (1985); *Crawford*, 541 U.S. at 59 (reaffirming the holding in *Street*). In addition, this Court will not review a state court's interpretation of its own law in a federal habeas corpus proceeding, *Dickerson v. Guste*, 932 F.2d 1142, 1154 (5th Cir. 1991), including state court evidentiary rulings. *Mercado v.*

---

[8] Although he cites to *Crawford* in his petition, *see* Rec. Doc. 1 at 36 (noting correctly that *Roberts* was abrogated by *Crawford*), he also broadly presents his claim that he was deprived of his right to confrontation as guaranteed by the federal constitution. Rec. Doc. 1 at 17, 28. Furthermore, the Court must liberally construe the pleadings of a *pro se* petitioner and not hold them to the same stringent standards as formal pleadings drafted by lawyers (as it is reminded by petitioner himself, *see* Rec. Doc. 1 at 24). *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see also U.S. v. Patterson*, 211 F.3d 927, 929 (5th Cir. 2000) (concluding that pro se petitioner had sufficiently raised the issue of equitable tolling even though he had not specifically made that argument); *Felder v. Johnson*, 204 F.3d 168, 170 n.5 (5th Cir. 2000) (same).

*Massey*, 536 F.2d 107, 108 (5th Cir. 1976). A federal habeas court does "not sit as a 'super' state supreme court" to review errors under state law. *Martin v. Wainwright*, 428 F.2d 356, 357 (5th Cir.1970), *cert. denied*, 400 U.S. 918 (1970).

However, whether or not Artberry's out-of-court statements were indeed used against petitioner for their truth determines whether his Confrontation Clause right is implicated, and, this Court must determine whether that right was violated. If the admitted statements were hearsay, they must be examined under *Ohio v. Roberts* to determine whether their admission violated petitioner's Confrontation Clause rights. The application and implementation of Art. 801(D)(1)(b) in petitioner's case was highly questionable; even when properly applied, the line between substantive and non-substantive use of evidence admitted pursuant to this rule is a subtle one. Discussion of the nature, origin, and requirements of this "exclusion" is necessary for understanding whether the failure to adhere to the requirements of the rule in this situation may have rendered the admitted evidence hearsay, thereby implicating the Confrontation Clause. In addition, the jury was never instructed not to consider the statements substantively. Finally, the prosecution ultimately destroyed any non-hearsay purpose they may have had by arguing and inviting use of the statements for their truth. For the reasons below, the Court concludes that Artberry's statements were admitted and used at trial for their truth.

**I.  The admission and use of Artberry's statements at trial**

In *Tennessee v. Street*, the Supreme Court recognized that Confrontation Clause issues arose in previous cases because hearsay evidence had been admitted as substantive evidence. 471 U.S. at 413 (citing *Roberts*, 448 U.S. at 77; *Dutton v. Evans*, 400 U.S. 74, 79 (1970)). The

prosecutor in that case had introduced the confession of an accomplice (who did not testify at trial) not to prove the truth of his assertions, but instead to rebut the respondent Street's contention that his own confession was coerced and derived from that of his accomplice. Introduction of the accomplice's confession was highly relevant to the jury's consideration of Street's allegations and its weighing of his confession; it was necessary so the "jury could compare the two confessions to determine whether it was plausible that respondent's account of the crime was a coerced imitation." *Id.* at 414.

> The *nonhearsay* aspect of Peele's confession - not to prove what happened at the murder scene but to prove what happened when respondent confessed - raises no Confrontation Clause concerns. The Clause's fundamental role in protecting the right of cross-examination, see [*Douglas v. Alabama*, 380 U.S. 415, 418 (1965)], was satisfied by Sheriff Papantoniou's presence on the stand. If respondent's counsel doubted that Peele's confession was accurately recounted, he was free to cross-examine the Sheriff. By cross-examination respondent's counsel could also challenge Sheriff Papantoniou's testimony that he did not read from Peele's statement and direct respondent to say the same thing. In short, the State's rebuttal witness against respondent was not Peele, but Sheriff Papantoniou.

*Id.* (emphasis in original). Indeed, cross-examination of Peele himself would have "been ineffective to undermine the prosecutor's limited purpose in introducing Peele's confession." *Id.* at 416.

The Court also recognized, however, that Peele's statement could have been misused by the jury. "If the jury had been asked to infer that Peele's confession proved that respondent participated in the murder, then the evidence would have been hearsay; and because Peele was not available for cross-examination, Confrontation Clause concerns would have been implicated." *Id.* at 414. The Court then stressed that the jury had been "pointedly" instructed,

multiple times, not to consider the truthfulness of the accomplice's statements in "any way whatsoever." *Id.* at 412, 414-15.

In this case, Detective Tucker began to testify about what Artberry had told him in his second statement at the police station, and the defense immediately objected that this was hearsay. The prosecutor argued that it was offered not for its truth, and the court allowed Tucker to testify for the purposes of relating how he conducted his investigation. Defense counsel moved for a mistrial on the grounds that the statements had never been cross-examined. The state then moved to introduce transcribed copies of the statements themselves and to play recordings of the statements. At the hearing outside the presence of the jury, defense counsel objected again on hearsay and confrontation grounds, and moved for a mistrial if the tapes and transcripts were introduced. The state argued that the Louisiana Supreme Court had already ruled allowing their admission, and that they were admissible as impeachment or under LA.C.E. art. 801(D)(1)(b) as prior consistent statements to rebut the implied charge by defense counsel that Artberry could not be trusted. The trial judge overruled the objection, and the state introduced the statements and played the tapes to the jury.

### a. The Decision of the Louisiana Fifth Circuit on Direct Appeal

The Louisiana Fifth Circuit, in its review of petitioner's direct appeal, rejected the state's argument that the statements were admissible to explain "how [Detective Tucker] conducted his investigation." *Jones*, 841 So.2d at 973-974. The court discussed prior Louisiana Supreme Court cases recognizing that evidence admitted under such a theory frequently has an impermissible hearsay aspect as well as a permissible hearsay aspect, the great danger that such

33

evidence would be misused, and that admission for such reasons is an area of widespread abuse. *See State v. Broadway*, 96-2659 (La. 10/19/99), 753 So.2d 801, 809, *cert. denied*, 529 U.S. 1056 (2000) ("[T]he fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant's guilt that would otherwise be barred by the hearsay rule"); *State v. Hearold*, 603 So.2d 731, 737 (La. 1992) ("The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted"); *State v. Wille*, 559 So.2d 1321, 1331 (La. 1990) ("The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule") (citing G. Pugh, Louisiana Evidence Law 429-431 (1974)).

Although this justification for the admission of Artberry's statements is not before this Court as the Louisiana state courts rejected such use of the statements, it emphatically agrees with their conclusion. The arguable relevance of such statements for showing Detective Tucker's conduct is slight when compared with their significant relevance as evidence that Jones committed the murder, and the danger that the jury would use the statements for that impermissible purpose was great. Allowing such evidence to show the "course of the investigation" here would potentially eviscerate the protections of the Confrontation Clause. *See U.S. v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) ("Allowing agents to narrate the course of their investigations and thus spread before juries damning information that is not subject to

34

cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule"); *U.S. v. Hearn*, 500 F.3d 479 (6th Cir. 2007); *State v. Smothers*, 05-KA-781 (La.App. 5 Cir. 3/28/06), 927 So.2d 484, 491 ("Marginally relevant nonhearsay evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross examination at trial"); *see generally*, Jeffrey L. Fisher, *The Truth About the "Not for Truth" Exception to* Crawford, 32 FEB CHAMPION 18 (Jan/Feb 2008).[9]

The Louisiana Fifth Circuit also recognized that, although the prosecutor had argued that the Louisiana Supreme Court had previously held that the state might use Artberry's statements as evidence at trial, a reading of the opinion showed that such was not the case. *Jones*, 841 So.2d at 975 (citing *Jones*, 791 So.2d at 628).[10] The court of appeals concluded that there was nothing in the opinion that could be reasonably interpreted as sanctioning the use of the recorded statements by *the state* as direct evidence. *Id.*

The court of appeals also recognized that it

appear[ed] the State primarily used the recorded statements to bolster its case

___

[9] Fisher notes the astute observation of the Georgia Supreme Court, that "a criminal prosecution is designed to find the truth of what a defendant did, and on occasion, of why he did it. It is *most unusual* that a prosecution will properly concern itself with why an *investigating officer* did something." Fisher, 32 FEB-Champion at 19 (quoting *Brown v. State*, 549 S.E2d 107, 111 (Ga. 2001) (emphasis added by Fisher).

[10] "The Supreme Court addressed the admissibility of Artberry's motion hearing testimony, and whether defendant's confrontation rights were violated. The court did suggest that defendant might introduce the statements 'to acquaint jurors with all of the circumstances surrounding the witness's identification of respondent and thereby allow them to reach a reliable determination as to the accuracy of the identification.'" *Jones*, 841 So.2d at 975 (quoting *Jones*, 791 So.2d at 628).

against defendant. Artberry's motion hearing testimony primarily concerned identification procedures, and did not contain a great many details regarding the events leading up to the murder. Artberry's second statement gave a more detailed description of the murder, and specifically named defendant as the perpetrator.

*Jones*, 841 So.2d 965, 975. However, the court concluded that the statements "could be offered as consistent statements intended to 'rebut an express or implied charge against [Artberry] of recent fabrication or improper influence or motive.'" *Id.* (citing L.A.C.E. art. 801(D)(1)(b)). It concluded that the defense had attacked Artberry's motive for identifying the petitioner and that this allowed the state to use Artberry's prior recorded statements for rehabilitation, describing the attacks as follows:

> Defense counsel throughout the trial attacked Mr. Artberry's credibility, alleges that he made false statements to the police, and that Mr. Artberry was in fact the perpetrator of the murder. Beginning in opening arguments defense counsel makes reference to Mr. Artberry's first statement in which Mr. Artberry claims he didn't know who committed the murder. Defense counsel continues in his opening statement to say that sometimes [sic] later while Mr. Artberry is still in police custody and a possible suspect, Mr. Artberry's story got spun into identifying the defendant, Terrence Jones. Defense counsel continues to attack Mr. Artberry's identification of the defendant as the perpetrator throughout the trial by suggesting that the shot that killed the victim could have come from inside Mr. Artberry's fence. Defense counsel suggested that Ms. Brue was a principal to murder and that Mr. Artberry was the killer. During the trial defense counsel repeatedly indicated he wished to impeach Mr. James Artberry's credibility. Defense counsel later argues that the testimony of the investigating officers corroborated his opening statement in which he indicated that Artberry lied to the police. The attack on Artberry's motive for identifying defendant allowed the State to use Artberry's prior recorded statements as a rehabilitative measure.

*Id.* The state appellate court upheld the admission at trial of Artberry's statements, which were purportedly offered not for their truth, but instead to "buttress" the testimony of the state's

witnesses in response to defense counsel's attacks on Artberry's motive for identifying Jones as the perpetrator. *Id*. at 976. At trial the defense repeatedly objected that Artberry's statements were hearsay, that Art. 801(d)(1)(B) was not applicable in this situation, and requested a mistrial when they were admitted and the tapes played for the jury.

Again, the Court does not review the state court's decision regarding the application of the state evidentiary rule itself. But the Court finds a full discussion of the requirements and applicability of this rule, the hearsay "exclusion" for certain prior consistent statements of a witness, necessary to appropriately determine whether Artberry's statements were used at petitioner's trial for their truth. If they were, the Court then must apply the test from *Roberts* and determine whether their admission violated petitioner's Sixth Amendment rights. If not, then the Confrontation Clause is simply not implicated at all.

### b. Article 801(D)(1)(b)

Under both the Louisiana and federal rules of evidence, hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.C.E. art. 801(C); FED.R.EV. 801(c). The very same rule (or article) goes on to define several "statements which are not hearsay." La.C.E. art. 801(D). Included are "prior statement[s] by [a] witness," at Art. 801(D)(1), which further contains the provision at issue:

> A statement is not hearsay if: **(1) Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is: ...
> (b) Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

The state and federal versions of this rule are almost textually identical.[11]  The rule reflects the recognition of the "'troublesome' logic of treating a witness' prior consistent statements as hearsay at all (because the declarant is present in court and subject to cross examination)."  *Tome v. U.S.*, 513 U.S. 150, 157 (1995) (citing the Advisory Committee's Notes on FED.R EV. 801(d)(1), 28 U.S.C.App., p773).  When the requirements of the rule are met, the declarant will be on the stand at trial, subject to cross-examination concerning the statements and able to confirm or deny making them, all in front of a jury who can assess the declarant's credibility with regard to the statements at issue; thus the rule defines such statements as simply "not hearsay."[12]  Indeed, "[i]f the witness admits on the stand that he made the statement and that

---

[11] The only differences are that the state article replaces some subsequent references to "the declarant" in the federal rule with the pronoun "him," use of capital and lower-case letters for subsections is inverted (i.e., "(D)" and "(d)"), and in some non-substantive punctuation.

[12] The Advisory Committee Note cited by the Court in *Tome* describes the logic underlying the rule:

**Note to Subdivision (d).** Several types of statements which would otherwise literally fall within the definition are expressly excluded from it:

**(1)** *Prior statement by witness.* Considerable controversy has attended the question whether a prior out-of-court statement by a person *now available for cross-examination concerning it, under oath and in the presence of the trier of fact,* should be classed as hearsay. If the witness admits on the stand that he made the statement and that it was true, *he adopts the statement and there is no hearsay problem.* The hearsay problem arises when the witness on the stand denies having made the statement or admits having made it but denies its truth. The argument in favor of treating these latter statements as hearsay is based upon the ground that the conditions of oath, cross-examination, and demeanor observation did not prevail at the time the statement was made and cannot adequately be supplied by the later examination. The logic of the situation is troublesome. So far as concerns the oath, its mere presence has never been regarded as sufficient to remove a statement from the hearsay category, and it receives much less emphasis than cross-examination as a truth-compelling device. While strong expressions are found to the effect that no conviction can be had or important right taken away on the basis of statements not made under fear of prosecution for perjury, *Bridges v. Wixon,* 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), the fact is that, of the many common law exceptions to the hearsay rule, only that for reported testimony has required the statement to have been made under oath. *Nor is it satisfactorily explained why cross-examination cannot be conducted subsequently with success.* The decisions contending most vigorously for its inadequacy in fact demonstrate quite thorough exploration of the weaknesses and doubts attending the

it was true, he adopts the statement and there is no hearsay problem." Advisory Committee Note.

The requirement that the declarant be subject to cross-examination at the trial concerning the statements is clearly a necessary condition of such statements being defined as "not hearsay." The language of the both the federal and state rule is clear in this respect: "The rule envisions a situation where the hearsay declarant is available at trial (or as here, at deposition) to be cross-examined about his prior consistent statement when it is introduced." *U.S. v. Deeb*, 13 F.3d 1532, 1535 (1994); *see also, U.S. v. Bordeaux*, 400 F.3d 548, 557 (8th Cir. 2005) (concluding that out-of-court statements were hearsay and should not have been admitted under FED.R.EV. 801(d)(1)(B) because the declarant did not testify at the trial and was not subject to cross-examination). When the preconditions of the rule are satisfied, the statements are nonhearsay and admissible as substantive evidence. *Tome*, 513 U.S. at 157.

As a result of the requirement that the declarant be available and subject to cross-examination at trial, there is ordinarily no confrontation clause issue presented when statements are properly admitted pursuant to Rule 801(d)(1)(B). "The Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *California v. Green*, 399 U.S. 149, 158 (1970); *see also Regan v. Hoffner*, 209 F.Supp.2d 703, 716 (E.D.Mich. 2002) ("The victim

---

earlier statement. *State v. Saporen*, 205 Minn. 358, 285 N.W. 898 (1939); *Ruhala v. Roby*, 379 Mich. 102, 150 N.W.2d 146 (1967); *People v. Johnson*, 68 Cal.2d 646, 68 Cal.Rptr. 599, 441 P.2d 111 (1968). In respect to demeanor, as Judge Learned Hand observed in *Di Carlo v. United States*, 6 F.2d 364 (2d Cir.1925), when the jury decides that the truth is not what the witness says now, but what he said before, they are still deciding *from what they see and hear in court* (emphasis added).

was subject to cross-examination at trial, so admission of the statement [pursuant to Michigan version of Rule 801(d)(1)(B)] presented no Confrontation Clause problems").

In *Tome*, the Supreme Court held that the federal version of the rule incorporates the common law pre-motive requirement, resolving a long-standing circuit split on the issue. 150 U.S. at 155-56. That is, a prior consistent statement "introduced to rebut a charge of recent fabrication or improper influence or motive [is] admissible if the statement had been made before the alleged fabrication, influence, or motive came into being, but it [is] inadmissible if made afterwards." *Id.* at 156. The Court noted that the basis for this rule at common law was one of relevancy, citing McCormick and Wigmore. "'[T]he applicable principle is that the prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence, or incapacity originated.'" *Tome*, 513 U.S. at 156 (citing E.Cleary, McCormick on Evidence § 49, p. 105 (2d ed. 1972)).[13]  *see also U.S. v. Harris*, 761 F.2d 394, 399 (7th Cir. 1985). Furthermore, the Court concluded that rebutting an alleged motive is the only purpose for which prior consistent statements may be admitted: "Prior

---

[13]  *See also United States v. Quinto*, 582 F.2d 224 (2nd Cir. 1978). In most situations, "'the witness is not helped by (the prior consistent statement;) even if it is an improbably or untrustworthy story, it is not made more probable or more trustworthy by any number of repetitions of it.' 4 Wigmore, Evidence s 1124, at 225 (Chadbourn rev. 1972) .... Only [when made prior to the time the supposed motive to falsify arose] was the prior consistent statement 'relevant' on the issue of credibility; that is, it tended to make the trustworthiness of the witness's in-court testimony more probable, after that testimony had been assailed, inasmuch as the consistency of the prior statement with the witness's testimony at trial made it 'appear that the statement in the form now uttered was independent of the (alleged) discredited influence.' 4 Wigmore, evidence s 1128, at 268 (Chadbourn rev. 1972)." *Id.* at 232-233. If the prior statement was not made prior to the time the alleged motive arose, it generally has no logical relevance, and would thus not be admissible under FED.R.EV. 401 and 402; "A former consistent statement helps in no respect to remove such discredit as may arise from a contradiction by other witnesses. When B is produced to swear to the contrary of what A has asserted on the stand, it cannot help us, in deciding between them, to know that A has asserted the same thing many times previously. If that were an argument, then the witness who had repeated his story to the greatest number of people would be the most credible." *Id.* at 234-235 (quoting 4 Wigmore, Evidence s 1127, at 267 (Chadbourn rev. 1972));  *see also U.S. v. Harris*, 761 F.2d 394, 399 (7th Cir. 1985).

consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited.... The Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told." *Id.* at 157-58.

Although the text of the Louisiana rule is essentially identical to that of the federal rule, the conclusion of the *Tome* court that the common-law pre-motive requirement is incorporated into the federal rule does not control what remains a state evidence rule. Although the Comments to Part (b) of Art. 801(D)(1) note that it "is based on Federal Rule of Evidence 801(d)(1)(B)," they explain that "[i]n this Article the requirement that the statement have been made at an unsuspicious time has been eliminated. But see Article 403."[14] LA.C.E. art. 301, Comments to Article 801(D)(1) - 1988. As suggested by the reference to Rule 403, however, the "unsuspicious time" analysis remains crucial to the admission of evidence under the article, but such consideration enters through the relevancy requirements of articles 401 to 403.[15] This view

---

[14] The Louisiana Provision that this article replaced, LA.R.S. 15:497, explicitly contained the requirement that the prior statement had been made at an "unsuspicious time." It provided that " Evidence of former consistent statements is inadmissible to sustain a witness who has been impeached by proof of former inconsistent statements, unless his testimony be charged to have been given under the influence of some improper or interested motive, or to be a recent fabrication, in which case, in order to repel such imputation, it is proper to show that the witness made a similar statement at a time when the supposed motive did not exist and the effect of such statement could not be foreseen. But when a witness has been impeached by evidence of declarations inconsistent with his testimony, he can not be corroborated by statements made subsequent to such declarations." Repealed by Acts 1988, No. 515, § 8, eff. Jan. 1, 1989.

[15]     **Art. 401. Definition of "relevant evidence."** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**Art. 402. Relevant evidence generally admissible; irrelevant evidence inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible.

was explained by the Louisiana First Circuit:

> In a leading treatise on Louisiana evidence law, the authors' notes indicate that the analysis as to the admissibility of a statement under Article 801(D)(1)(b) of the Louisiana Code of Evidence would necessitate a determination of whether the statement was made at a time when the alleged bias or motive to lie did not exist, in order for it to satisfy the relevancy requirements of Articles 401 through 403. See George W. Pugh, Robert Force, Gerald A. Rault, Jr., and Kerry Triche, Handbook on Louisiana Evidence Law 464 (1999). The notes indicate that Article 801(D)(1)(b) "does not deal with relevancy.... Statements consistent with testimony made subsequent to the ... circumstances suggesting a motive to fabricate generally have insufficient relevancy to be admissible." Id. Again, the authors' notes are not authority; however, because this issue of Louisiana evidence law has not been addressed by this circuit or by the Louisiana Supreme Court since the adoption of the Code of Evidence, the authors' notes are persuasive as to the proper analysis to be used when examining the admissibility of a statement introduced under Article 801(D)(1)(b).

*State v. Milto*, 1999-KA-0217 (La.App. 1 Cir. 11/5/99), 751 So.2d 271, 274-75 (footnotes omitted). The court also noted that the U.S. Supreme Court in *Tome* had since interpreted the federal rule, upon which Art. 801(D)(1)(b) is based, to include the pre-motive requirement. *Id.* at 275 n.2. Prior to the *Tome* decision, several federal courts of appeals had also considered the pre-motive requirement to be simply one of relevance. *U.S. v. Miller*, 874 F.2d 1255, 1272 (9th Cir. 1989) ("the requirement of no motivation to fabricate does not arise from anything in the literal terms of Rule 801(d)(1)(B); rather, the requirement emerges from relevancy concerns under Rules 402 and 403") (*citing Harris*, 761 F.2d at 399); *see also Quinto*, 582 F.2d at 234-235.

---

**Art. 403. Exclusion of relevant evidence on grounds of prejudice, confusion, waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

Another prevalent, though ultimately ethereal, distinction had occupied courts' analysis

of the admission of witnesses' prior consistent statements prior to the *Tome* decision: that

between admission of the statements for substantive use, or solely for the purpose of

rehabilitating a witness' impeached credibility.  As noted above, the rules make statements

admissible as "not hearsay" under Rule 801(d)(1)(B) admissible as *substantive* evidence.   Prior

to *Tome*, some courts had applied one analysis to statements offered as substantive evidence

under the rule, and a less stringent one to evidence introduced solely for rehabilitative

purposes.[16]  This distinction had also overlapped with the question whether the common law pre-

motive requirement was incorporated in the federal rule.[17]   *Tome* concluded that the Rule itself

---

[16] *See U.S. v. Lozada-Rivera*, 177 F.3d 98, 103 (discussing debate in cases whether Rule 801(d)(1)(B) controls prior consistent statements of all stripes or whether a more relaxed test applies when a prior statement is offered for a rehabilitative purpose).

[17] *See, e.g., U.S. v. Harris*, 761 F.2d 394, 399 (citing several cases and concluding that was "now settled that this condition [requiring that the motive to fabricate must not have existed at the time the prior statements were made] need not be met to admit into evidence prior consistent statements which are offered to rehabilitate a witness rather than as evidence of the matters asserted in those statements"); *U.S. v. Brennan*, 798 F.2d 581, 587-88 (2nd Cir. 1986); *U.S. v. Rubin*, 609 F.2d 51, 66 (2nd Cir. 1979) (Friendly, J., concurring), *aff'd on other grounds*, 449 U.S. 424 (1981); *but see U.S. v. Miller*, 874 F.2d 1255, 1272-74 (9th Cir. 1989) (rejecting idea that there was a class of prior consistent statements, offered for rehabilitation, that does not fall within the literal scope of Rule 801(d)(1)(B)); *Quinto*, 582 F.2d at 233 (concluding that the standards for determining whether prior consistent statements can now be admitted under the rule as substantive evidence are precisely the same as the traditional standards for rehabilitation).  The *Miller* court explained its rejection of different treatment for prior statements admitted solely for rehabilitative purposes as follows:

> We reject the distinction drawn in both *Harris* and *Brennan*. We do so for two reasons. First, since the requirement of no prior motive to fabricate is rooted in Rules 402 and 403, and not in the terms of Rule 801(d)(1)(B), there is no basis for limiting the requirement to cases involving prior statements under Rule 801(d)(1)(B). Indeed, we fail to see how a statement that has no probative value in rebutting a charge of "recent fabrication or improper influence or motive," *see* FED.R.EV. 801(d)(1)(B), could possibly have probative value for the assertedly more "limited" purpose of rehabilitating a witness. If "repetition does not imply veracity," *see Harris*, 761 F.2d at 399, then proof of repetition cannot rehabilitate.
> Second, the distinction drawn by *Harris* and *Brennan* is inconsistent with the legislative history of Rule 801(d)(1)(B). Prior to the adoption of Rule 801(d)(1)(B), prior consistent statements were traditionally only admissible for the limited purpose of rebutting a charge of recent fabrication or improper influence or motive. *See* FED.R.EV. 801(d)(1)(B) advisory committee's notes. The Rule goes one step further than the

had incorporated the common law pre-motive requirement, allowed statements which formerly would have been admissible only for rehabilitative purposes to be used for their truth, and rejected the use of the rule for any purpose other than for rebutting an alleged motive. It thus appears that "*Tome* may be read as establishing one rule for both [substantive and rehabilitative] uses of prior consistent statements" and has vanquished the idea that any prior consistent statement may be admitted outside of the controls of Rule 801(d)(1)(B). *See* WEINSTEIN, EVIDENCE ¶ 607.10[1] at 607-111 (1997); *but see Lozada-Rivera*, 177 F.3d at 103 (stating that there remained an "as yet unresolved legal dilemma concerning the extent to which the Rule altered preexisting common law standards governing rehabilitative use of prior statements" and concluding that it "need not settle on precisely how these elements (i.e., Rule 801(d)(1)(B), *Tome*, and the common law notion of rehabilitation) fit together").

The question whether these debates about federal rule 801(d)(1)(B) were resolved by *Tome* is academic, and only relates to the present case in that they tend to overstate or overdramatize the actual difference between substantive and rehabilitative uses of prior consistent statements. The authors of the rule itself recognized the very narrow line between use of prior consistent statements for merely rehabilitative purposes (that is, for "credibility

---

common law and admits all such statements as substantive evidence. *Id.* The Rule thus does not change the type of statements that may be admitted; its only effect is to admit these statements as *substantive* evidence rather than solely for the purpose of rehabilitation. Accordingly, it no longer makes sense to speak of a prior consistent statement as being offered solely for the more limited purpose of rehabilitating a witness; any such statement is admissible as *substantive* evidence under Rule 801(d)(1)(B). In short, a prior consistent statement offered for rehabilitation is either admissible under Rule 801(d)(1)(B) or it is not admissible at all. The distinction drawn by *Brennan* and *Harris* is therefore untenable.

874 F.2d at 1272-73 (footnotes omitted).

purposes, not for the truth of its contents," *see Lozardo -Rivera*, 177 F.3d at 103), and full

substantive use, and when the preconditions of the rule are met, did away with that distinction

altogether.  Even courts that recognize extra-rule use of such statements for merely rehabilitative

purposes have conceded the difference may be an "unrealistically subtle" in light of the effect a

jury may be inclined to give such statements.  *Harris*, 761 F.2d at 400.  In adopting their own

version of the federal rule, the commentors to the California Evidentiary Code stated that

> There is no reason to perpetuate the subtle distinction made in the cases.  It is not
> realistic to expect a jury to understand that it cannot believe that a witness is
> telling the truth on a former occasion even though it believes that the same story
> given at the hearing is true.

That distinction is the difference between allowing a jury to consider a witness's prior

statement, one consistent with the witness's in-court testimony, as tending to make that in-court

testimony more likely to be true (and the trustworthiness of the witness more probable) on the

one hand, and the substantive treatment of that prior statement itself as true on the other.  There

is a theoretical, logical distinction (one that is easier to write than to grasp), but it is one so subtle

that in practice it is "unrealistic" to expect or ask a jury to make.  After all, the prior out-of-court

statement is presumably the same or very similar to the in-court statement.  Further, the

allowance of the use of the prior statement as substantive evidence recognizes that there is no

reason to perpetuate the near-meaningless distinction;  the declarant is on the stand subject to

cross-examination regarding the statement.   By testifying that he made the statement and that it

was true, he adopts the prior statement.  The jury is able to assess the declarant's testimony as he

adopts the prior statement.  As Judge Weinstein has noted, "as a practical matter, the jury in all

probability would misunderstand or ignore a limiting instruction anyway, so there is no good reason for giving one." WEINSTEIN J., AND M. BERGER, EVIDENCE ¶ 801(d)(1)(B)[01] at 801-188 (1990).

### c. Application of Art. 801(D)(1)(b) at petitioner's trial

While the federal courts of appeals have pondered the uses, requirements, and theories underlying the rule at length, the state trial judge and appellate court appear to have ignored the prerequisites of Art. 801(D)(1)(b) altogether. Artberry, deceased well before petitioner's trial, clearly did not testify at his trial and was therefore clearly not subject to cross-examination concerning the statements the state sought to admit pursuant to the rule. The whole justification for defining such statements as "not hearsay," however, is that the declarant is available and testifies such that he can be cross-examined about the alleged motive and prior statements, and that the jury thus is able to assess his demeanor and credibility. It is for these reasons that such statements are allowed in as substantive evidence. The state appellate court never considered whether Artberry had testified or been cross-examined concerning his statements as it applied the rule. *Jones*, 841 So.2d 965, 975-76. Moreover, in discussing prior Louisiana decisions as precedent for admitting Artberry's prior statements under Art. 801(D)(1)(b), the court explicitly noted that in both, the witness had been cross-examined at trial. *Jones*, 841 So.2d at 976 (citing *State v. Easter*, 32,940 (La.App.2 Cir., 4/7/00), 756 So.2d 703, 707 and *State v. Ball,* 32,498 (La.App. 2 Cir. 12/15/99), 748 So.2d 1239). Not only did Artberry not testify at petitioner's trial, subject to cross-examination, he had never been subject to cross-examination "concerning

the statement."[18]  The prosecution had failed to disclose even the existence of the prior statements, despite a discovery request by the defense, at the time of the suppression hearing. Indeed, the statements were not actually disclosed to the defense until the middle of petitioner's first trial.

The Louisiana Fifth Circuit did note that "[t]he mere fact of a prior inconsistent statement is insufficient to ground the admissibility of the antecedent consistent statement under this provision; there must have been an express or implied suggestion that the witness changed his story because of some purported motive to falsify."  *Jones*, 841 So.2d at 975.  While the court correctly noted the limited circumstances justifying introduction of prior consistent statements under the rule, its subsequent application of this precondition of the rule is dubious.  The court describes defense counsel's attack on Artberry's credibility, which was essentially that Artberry,

---

[18] Any argument attempting to misread the meaning of "trial *or hearing*" and justify the admission of Artberry's statements under Art. 801(D)(1)(b) because the defense was able and did cross-examine Artberry at the suppression hearing is a non-starter.  Petitioner's opportunity to cross-examine Artberry at the hearing is precisely why that hearing transcript was admissible under Art. 804(B)(1), even though his "opportunity" to cross-examine was rendered less effective by virtue of the state's failure to disclose the existence of the statements.  *Jones*, 791 So.2d at 626-27.  It is abundantly clear from the text of Art. 801 itself that, in order for a prior consistent statement to be admitted at a trial or hearing, the declarant must testify at *that* trial or hearing.  Art. 801(D)(a) defines certain statements that are not hearsay when the declarant "testifies at *the* trial or hearing." This can only be understood in conjunction with the meaning of hearsay at Art. 801(C): those statements "*other* than one made by the declarant while testifying at *the* trial or hearing."

The United States Supreme Court was incredulous at an argument put forth by the state in *Lee v. Illinois*, in a case involving a challenge to the admission of uncross-examined confession of a co-defendant as substantive evidence against the defendant:  "Illinois makes the somewhat surprising argument ... that this case does not present any Confrontation Clause issue since Lee was afforded an opportunity to cross-examine Thomas during [a previous] suppression hearing.  We disagree."  *Lee v. Illinois*, 476 U.S. 530, 546 n.6 (1986).  The hearing testimony might have been admissible under Art. 804(B)(1) because of Jones' prior opportunity to cross-examine Artberry, at that hearing.  However, the argument that *that* opportunity to cross-examine, as ineffective as it was due to the state's failure to disclose even the existence of the statements beforehand, might satisfy the Confrontation Clause with regard to the admission of the statements as well would strain any rational understanding of the clause to the breaking point.  *See Id.*; *California v. Green*, 399 U.S. 149, 158 (1970) (concluding that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination").

with the assistance of Gelandra Brue, was the killer, and that he identified the petitioner in order to deflect the blame from himself after Artberry, while in police custody, came to believe he was a suspect. *Id.* at 975-76.[19] However, there is no articulation or examination of how Artberry's second and later statements serve to actually rebut this charge. On examination it becomes clear that the statements have little or no relevance in rebutting the attacks made on Artberry's credibility. Defense counsel suggested, in his opening statement and during cross-examination of witnesses, that Artberry had fabricated his incrimination of petitioner because he himself was guilty. When Artberry altered his story to identify the petitioner by name, and gave his second statement, he had the very same alleged motive to fabricate as he did when he made the first statement, and as he did when he testified at the suppression hearing much later. Whether considered as a matter of the pre-motive requirement of the rule itself (as it would be in a federal court), or merely as a matter of relevance, *see Milto*, 751 So.2d at 274-75, it is hard to see how the subsequent statements serve (beyond mere repetition) to rebut the charge made.[20]

_____

[19] In recognizing that the defense never introduced any evidence to impeach Artberry, the court reasoned that Art. 801(D)(1)(b) speaks of a response to an express or implied "charge" rather than the introduction of evidence. *Id.* at 975. This understanding of the trigger for use of the rule is consistent with those of other courts. *See e.g., U.S. v. Zito*, 467 F.2d 1401, 1404 (2nd Cir. 1972) (implied charge contained in defense counsel's opening statement and persistent inquiries during cross-examination authorized admission of prior statements under Rule 801(d)(1)(B)).

[20] Again, the Court can not, and does not, examine the state court's application to its own evidentiary rules for error in that application. However, as discussed below, it is appropriate to appreciate the minuscule relevance Artberry's statements had for any permissible, non-hearsay, purpose when considering whether those statements were indeed admitted and used for impermissible hearsay purposes. Of course, this discrepancy is the proper consideration of a trial court in application of Rule, or Article 403, in determining whether the probative value of certain evidence for a proper purpose is substantially outweighed by the danger of unfair prejudice (here the danger the jury will use for an impermissible, hearsay, purpose.) The Fifth Circuit has recognized that a trial court's discretion in the implementation of Rule 403 is necessarily limited by the Constitution of the United States, and that error in implementing the rule can be of constitutional proportion. *U.S. v. Davis*, 639 F.2d 239, 244 (5th Cir. 1981).

It is clear that there are significant problems with the admission of Artberry's prior statements under the state's parallel version of Rule 801(d)(1)(B). Despite this, the Court must assume that the state courts properly interpreted their own evidentiary rules, and that such statements were admissible under such rules. However, in considering whether the admission of such statements violated petitioner's rights under the Confrontation Clause of the federal constitution, the Court must be concerned with whether they were admitted and used as hearsay. Even if there were a rehabilitative purpose under which such statements could properly be admissible, outside of the terms of Art. 801(D)(1)(b), such statements could not be used for their truth without implicating the Confrontation Clause. The Court has discussed the provisions and implementation of Art. 801(D)(1)(b) in order to stress the very fine line between the theoretically proper use of such statements, for which they have little relevance, and the impermissible but highly relevant use of such statements for their truth.[21]

---

[21] At trial, the prosecutor argued that defense counsel had "opened the door" to the admission of the tapes because he had raised the issue of Artberry's truthfulness in his opening statement. State Rec. Vol. 9 at 795-97; Tr. trans. at 170-72. The prosecutor, however, did not use the term "opening the door"; the Louisiana Fifth Circuit employed the term in the court's description of the prosecutor's argument. *Jones*, 841 So.2d at 973. This vague term warrants a brief discussion.

The common law concept of "opening the door" is not a route for admissibility separate and apart from the rules of evidence. Rather, "opening the door" simply describes the application of those rules when one party "introduces evidence or takes some action that makes admissible evidence that would have previously been inadmissible." 21 CHARLES ALAN WRIGHT & KENNETH W GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE 2d § 5039 (2005). Evidence that was previously irrelevant, for example, may become relevant if the other party raises an issue, and may be admitted as long as it would not violate the Constitution of the United States, statutes, or another rule. *See* LA.C.E. art. 402. Or, a party may "open the door" to previously inadmissible evidence by triggering a specific evidence rule, such as when a criminal defendant "opens the door" under Rule 404(a)(1) to evidence of his bad character if he first introduces evidence of his good character. Here, for instance, defense counsel's charge that Artberry lied to implicate the petitioner because he himself had committed the crime potentially "opened the door" to prior consistent statements under Art. 801(D)(1)(b). When a prior consistent statement was made before the motive to fabricate arose, that statement may be relevant to rebut a charge of fabrication without regard to the truth of the prior statement. The simple fact that the statement was made before a particular point in time tends to rebut the charge that testimony was given because of an improper motive, and its relevance will not require the jury to assess the statement for its truth. Of course, compliance with an evidence rule does not itself

Artberry's statements, made while in police custody after originally claiming he could not identify the killer, and after the motive charged by the defense - that he himself had committed the crime - had arisen, are irrelevant to rebut the charge actually made. Arguably, the statements might be relevant in order to "amplify or clarify" the inconsistency between his first statement and his later statements and hearing testimony, *see Miller*, 874 F.2d at 1273-1274 (noting that other courts had concluded prior consistent statements may be admissible if they helped to amplify or clarify alleged inconsistent statements, where they cast doubt, for example, on whether the impeaching statements were actually inconsistent with trial testimony) (internal citation omitted); Artberry claimed he was scared of petitioner and therefore reluctant to identify him.

Again, however, any fear that existed at the time of his first statement presumably remained thereafter, at the time of his subsequent statements and at his hearing. If, as the defense alleged, Artberry had an improper motive to accuse petitioner of the crime because he himself had committed it, the same motive would drive him to embellish his explanation with claims he was scared. But more importantly, in order for the statements to be relevant to Artberry's assertions that he was scared and bolster or explain that claim, the jury would have to consider the assertions in the out-of-court statements themselves -  that petitioner was a drug-

---

guarantee satisfaction of the requirements of the Confrontation Clause. *See* LA.C.E. art. 402. (Again, evidence that satisfies the requirements of that rule will ordinarily be "not hearsay" and therefore not implicate the Confrontation Clause.)

Because the doctrine of "opening the door" involves straightforward application of the rules of evidence, as constrained by the Constitution, and because it is often conflated with other common law doctrines such as "estoppel to object" and "invited error," Profs. Wright and Graham have commented that "it would be no great loss if the phrase 'opening the door' disappeared from the lexicon of evidence law." 21 CHARLES ALAN WRIGHT & KENNETH W GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE 2d § 5039.1 (2005).

dealer, that he killed the victim over nineteen dollars - for their truth. That is, the jurors would have to consider whether those assertions were true in order to assess Artberry's claims he was scared. Such use of the statements would implicate the Confrontation Clause, and would require a determination whether they were properly admitted under *Ohio v. Roberts*.

In the end it makes no difference to the Confrontation Clause question presented here whether Artberry's statements could have been properly admitted for some relevant non-hearsay purpose, because after examining the entire record, it is clear that his statements were indeed admitted and used at trial for their truth. First, the jury was never instructed that such statements could only be considered for a limited, non-hearsay purpose. More importantly, the prosecutor, through further examination of Detective Tucker, invited consideration of the statements for their truth and destroyed any possible non-hearsay purpose they may have had.

### d. Absence of Instructions Not to Consider Statements for their Truth

In *Street*, the Court recognized that "[i]f the jury had been asked to infer that Peele's confession proved that respondent participated in the murder, then the evidence would have been hearsay; and because Peele was not available for cross-examination, Confrontation Clause concerns would have been implicated." 471 U.S. at 414. However, the Court noted, the jury "was pointedly instructed by the trial court 'not to consider the truthfulness of [Peele's] statements in any was whatsoever." *Id.* at 414-15 (citing the appellate record). The Court relied on those "point[ed]" instructions, along with the "crucial assumption that the jurors followed the instructions given them by the trial judge" in reaching its conclusion that the confession was not

hearsay and that therefore the Confrontation Clause was not implicated. *Id.* at 415 (internal citation and quotation omitted).

At no point does the record in petitioner's case reveal that the jury was ever instructed to consider Artberry's statements for some limited, non-hearsay, purpose, and not to consider the truth of the assertions therein. Without any sort of instruction to the contrary, it can fairly be assumed that a jury will consider all evidence for its truth, and this case is no different. *See U.S. v. Walker*, 148 F.3d 518, 524-25 (5th Cir. 1998), *abrogated on other grounds by Texas v. Cobb*, 523 U.S. 162 (2001), *abrogation recognized by Henderson v. Quarterman*, 460 F.3d 654, 663 (5th Cir. 2006).[22]

The Fifth Circuit in *Walker* considered a record that "reveal[ed] no attempt to clearly instruct or warn the jury that Walker's out-of-court statement was not being introduced" to prove what the statement asserted, "either before it was introduced ... or at the end of the trial." *Walker*, 148 F.3d at 524. The court reasoned that because the *Street* court had relied on the instructions to the jury to distinguish prior Confrontation Clause precedent, and because such instructions were absent in the case before it, prior Confrontation Clause precedent and not *Street* applied. *Id.* at 525.[23] The court concluded simply that "[w]here these warnings are absent, we cannot assume that the statement will not be 'misused by the jury.'" *Id.* at 524-25. *But see U.S. v. Mejia*, 909 F.2d 242, 247 (7th Cir. 1990) (concluding that where defendant never

---

[22] Here, the error was not the failure to give limiting instructions, it was to admit evidence that was impermissible hearsay if used for its truth. Defense counsel objected throughout that Artberry's statements were hearsay and that Art. 801(D)(1)(b) did not apply.

[23] The court did not inquire into whether instructions had been requested; indeed, it seems likely, because of the crucial nature of such instructions in this context, that had they been requested, the court would have noted it.

asked for limiting instruction regarding testimony he argued on appeal was impermissible hearsay, he could not complain about the lack of one on appeal).[24]

The danger of the jury using Artberry's statements for their truth was so high in this case, in light of the scant relevance they had for any possible non-hearsay purpose, that any limiting instruction would likely have been futile. *See Gaines v. Thieret*, 846 F.2d 402, 405 (7th Cir. 1988). Recalling the "unrealistically subtle" distinction between potentially proper, non-hearsay, rehabilitative use and improper hearsay use of prior consistent statements, and Judge Weinstein's recognition in the context of Rule 801(d)(1)(B) that "as a practical matter, the jury in all probability would misunderstand or ignore a limiting instruction anyway, so there is no good reason for giving one," WEINSTEIN J., AND M. BERGER, EVIDENCE ¶ 801(d)(1)(B)[01] at 801-188 (1990), it is exceedingly difficult for this Court to hypothesize what an effectual instruction might have said here. *See Gaines*, 846 F.2d at 405 (noting that where evidence is not that damaging, the failure of a defendant's counsel to request a limiting or curative instruction may forfeit his objection to the admission of the evidence, but that "this precept has little if any application [to the facts of that case], for what would the instruction have said?"). This is especially true considering that the trial court initially allowed introduction of Artberry's statements for a different purpose - in order to show the course of Tucker's investigation - than they were ultimately admitted and upheld by the appellate court. Finally, many of the most

---

[24] Notably, the defendant in *Mejia* only objected once at trial to the admission of the disputed testimony generally, and not specifically on hearsay grounds. *Mejia*, 909 F. 2d at 246-47. Here, petitioner's counsel objected repeatedly and specifically that Artberry's statements were hearsay and that the requirements of Art. 801(D)(1)(b) were not satisfied. Defense counsel at trial did not merely "st[and] mute while damaging testimony was being admitted," *Check*, 582 F.2d at 677 n. 28, nor did he ever stop arguing that Artberry's statements were inadmissible. *See Gaines*, 846 F.2d at 405.

prejudicial details asserted in the statements, such as that petitioner shot the victim while he was searching for his twenty-dollar bill, have no conceivable relevance for any non-hearsay purpose.[25]  Even if petitioner had requested and obtained a non-futile instruction from the trial judge that the jury only consider Artberry's statements for some permissible, non-hearsay purpose, any such non-hearsay purpose would have been destroyed by the prosecutor's subsequent actions at trial.

### e.  The Prosecution Destroyed Any Possible Non-hearsay Purpose of the Statements Through its Actions at Trial

As noted above, the Supreme Court stated in *Street* that "[i]f the jury had been asked to infer that Peele's confession proved that respondent participated in the murder, then the evidence would have been hearsay; and because Peele was not available for cross-examination, Confrontation Clause concerns would have been implicated."  471 U.S. at 414.   Here, after Artberry's statements were read and played to the jury, the prosecution invited the jury to consider those statements as evidence of how the murder occurred.  The prosecutor's actions negated *Street*'s essential assumption that no request of the jury be made where statements are purportedly admitted for a non-hearsay purpose.

"A non-hearsay statement may violate the Confrontation Clause if the trial court fails to give proper limiting instructions, if the prosecutor destroys the non-hearsay nature of the statement during the trial by arguing the truth of the matter, and if the statement implicates the

---

[25] Again, such details are arguably relevant for demonstrating why Artberry was afraid of the petitioner, but such relevance requires full consideration of the truth of the assertions, and does not justify admission of the evidence for non-hearsay purposes.

defendant." *U.S. ex rel. McCoy v. Welborn*, 857 F.Supp. 632, 637 (N.D.Ill. 1994) (citing *Lee v. McCaughtry*, 892 F.2d 1318, 1325-27 (7th Cir. 1990)); *see also Silva*, 380 F.3d at 1020-21 (7th Cir. 2004) (rejecting argument that admission of out-of-court statements as harmless, even where judge had told the jury that the statements had not been admitted for a substantive use, where prosecutor explicitly used in closing argument some of the hearsay as evidence of defendant's guilt); *Lozardo-Rivera*, 177 F.3d at 104. The "shield allowing the prosecution to use non-hearsay may be destroyed if the prosecutor misuses the statement." *Lee*, 892 F.2d at 1326 (citing *Richardson v. Marsh*, 481 U.S. 200 (1987). In contrast to the situation in *McCoy*, where the state "did not offer, introduce ... solicit ... [or] emphasize" an out-of-court statement for the truth of the matter asserted, the prosecutor here actively solicited testimony from Detective Tucker that emphasized the substance of Artberry's uncontested statements and invited the jury to consider them for their truth. *McCoy*, 857 F.Supp. at 637.

Artberry's statements contained many prejudicial and graphic assertions that are not duplicated in his hearing testimony and were never cross-examined, including repeated descriptions of the petitioner as a drug or "dope dealer." Most damning was his explanation of what appeared to be a dispute over payment in a drug-deal gone wrong: Artberry explained that petitioner gave the victim a rock of cocaine, which the victim put in his mouth to taste. The victim gave petitioner money, but thereafter Artberry claimed he heard the passenger of the car stating "man this is nothing but a dollar, where's my twenty-dollars?" State Rec. Vol. 11, statement of July 28, 1997 at 4:08 a.m., at 4 of 8. The victim attempted to search his pockets, and then his car for the money. Artberry claimed that the passenger said to "go ahead and take

his fucking head off," *Id.* at 5 of 8, and then petitioner shot him. Asked by Detective Tucker, "And they killed a man over a twenty dollar rock?" Artberry responded:

> Right. And the fellow gave him the gave him the [sic] rock back, after he didn't find a twenty dollar bill in his pocket he said I heard him say he said I know that's a twenty dollar bill cause I [sic] that's the only thing I had in my pocket. So he said he took the rock out of his mouth, gave it back to him, and he still shot him.

*Id.* at 6 of 8. Artberry then stated that the victim got back in his car. The description of the drug deal itself, the exchange and the dispute over whether the victim had given petitioner twenty dollars, went unmentioned in Artberry's hearing testimony. In essence, Artberry asserts that petitioner shot the victim in cold blood, after taking back the twenty-dollar rock of crack, over nineteen dollars. This unconfronted assertion was read and played to the jury in its entirety at trial.

As discussed above, any attempt to instruct the jury not to consider this highly prejudicial and damning assertion for its truth would likely have proven futile. Not only was no instruction given, minutes after the statements were admitted, the prosecutor, in a considered fashion, invited the jury to consider the truth of this very assertion. After testifying that he himself had observed a crumpled twenty-dollar bill in the armrest of the victim's car, Detective Tucker was asked by the prosecutor to recall his opportunity to interview all of the witnesses, "including Mr. Artberry, the statement we already played[.]" State Rec. Vol. 9 at 836; Tr. trans. at 211. The prosecutor proceeded to explicitly elicit from Tucker, "pursuant to [the statement]" and his own observation of the bill, his theory as to how the victim was shot. *Id.* He answered that "[t]he theory [he] arrived at was that the victim had no intentions of ripping off Terrance Jones, the

drug dealer." *Id.* at 837; Tr. trans. at 212. When defense counsel immediately objected that this was speculative and not based on Tucker's own knowledge, the judge conducted a bench conference. At that conference, the judge inquired what the jury had heard that allowed them to conclude "that a one-dollar bill was not given." *Id.* at 838; Tr. trans. at 213. The prosecutor replied that "I would be happy to show that to you. I don't know if it's in the prior transcript or if it's in the statements, but it is there."

The answer to the prosecutor's question, which he discovered when he found it and pointed it out to the judge, was that it was in the statements, but not the hearing transcript. The judge, over defense counsel's continuing objection and motion for mistrial, allowed the officer to testify to his theory that "while reaching into his vehicle to retrieve the twenty-dollar bill, the victim was shot with his arm extended." *Id.* at 850; Tr.trans. at 225. The Court does not now consider the separate question whether Tucker's opinion testimony was not admissible because he was not an expert witness and was not based on his personal knowledge. But it is clear from the record, the contents of Artberry's statements and his separate hearing testimony, as well as from the extended bench conference, that the factual bases for his testimony necessarily rested on Artberry's assertions about the argument over the twenty-dollar bill. With no other factual basis for considering Tucker's "theory," the jury was clearly invited to consider the statement for its truth. Indeed, the prosecutor, in leading up to the his question about Tucker's "theory," explicitly invoked Tucker's previous testimony regarding his previous opportunity to interview all of the witnesses, "including Mr. Artberry, the statement we already played." This leaves no doubt that the prosecutor purposefully sought to have the jury recall Artberry's statements as it

considered Tucker's ensuing testimony that he believed the victim was shot trying to find his twenty-dollar bill, and had no intention of "ripping off" the petitioner.

Notably, in its opening statement, the prosecution made specific reference to many of the details contained only in the statements Artberry gave to Detective Tucker at the police station, including the description of the dispute over the twenty-dollar bill:

> Terrence Jones turned to Marty Martin and said; "Hey what are you trying to do here? You didn't give me enough money." It turns out that instead of Marty Martin giving him a twenty dollar bill, he gave him a one-dollar bill. And Marty said; "Wait, I gave you twenty. It was a mistake. If you got one, it's a mistake. I know I've got a twenty dollar bill here somewhere." And then at that point James Artberry - Excuse me; Terrence Jones, who also has another passenger in his car. We don't know who that man is; he's never been identified. These people don't know him. But he's a passenger in the car. And he turns to the guy and says; "Take his F-ing head off."

State Rec. Vol. 10 at 6-7. After a description of the statements, and other evidence, the prosecutor concludes stating, "All of this evidence will come out." *Id.* at 11. Although the opening statement itself is not at issue (and the Court need not rely on it to reach its conclusion), it reveals that the prosecution intended to introduce, and to use as substantive evidence, Artberry's statements from the outset of the trial. The prosecutor invited the jury to consider what it would later hear about the interaction over the twenty-dollar bill, among other details that would only be revealed in Artberry's statements, for the truth of the assertions therein - that petitioner had shot the victim in cold blood over a what amounted to nineteen dollars

Having been asked to consider the truth of that specific component of Artberry's statement, alone is prejudicial enough in this Court's opinion to render the constitutional

violation not harmless, and without any instruction to the contrary, the jury undoubtedly considered the entirety of the statements for the truth of the matters asserted.

In concluding that Artberry's statements were admitted and used at trial for their truth, and that therefore the statements cannot be considered non-hearsay that does not implicate the Confrontation Clause under *Street*, it is worth considering the important ways this case differs from the situation present in that case. Street had claimed his own confession was not voluntary, and that he had been forced to repeat his co-defendant Peele's statement. The confession of Peele was highly relevant for the non-hearsay purpose to prove what happened when Street confessed - not to prove what happened at the murder scene. *Street*, 471 U.S. 409 at 414. Here, Artberry's statements had little to no relevance for rebutting his alleged motive for lying, that he himself had committed the crime, but had significant relevance to prove what happened at the murder scene. In *Street*, the defendant's counsel could challenge through cross-examination the testifying officer who read Peele's statement at trial, that he did not read from Peele's statement and direct respondent to say the same thing. *Id*. The jury could readily assess the officer's credibility because he was testifying in court. Here, the jury could not assess the credibility and truthfulness of Artberry's underlying assertions regarding what happened at the murder scene through cross-examination of Detective Tucker. Tucker had nothing to offer, except for pure hearsay, to rebut defense counsel's charge that Artberry lied to deflect blame from himself - which is purportedly the justification for introducing such out-of-court

statements.[26]  Tucker, unlike Sheriff Papantoniou, was simply not the appropriate rebuttal

witness to face cross-examination on Artberry's statements.  *Id.; see also Douglas*, 380 U.S. at

415.  In *Street*, cross-examination of Peele himself would have been wholly ineffective to

undermine the defendant's contention that he had been coerced to copy Peele's confession.

Here, cross-examination would have been necessary for petitioner to undermine, if necessary,

Artberry's claim that he was scared or did not fabricate his assertion to deflect blame from

himself.  The jury in *Street*, unlike here, was repeatedly and pointedly instructed not to consider

confession for its truth, and was never asked to infer that the confession proved Street had

participated in the murder.  Finally, the prosecutor at petitioner's trial deliberately and

dramatically invited the jury to consider the details in Artberry's statements for their bearing on

petitioner's guilt.

### ii.  Application of *Ohio v. Roberts* to Petitioner's Case

The Court has concluded that Artberry's statements were admitted and used for the truth

of the matters asserted.  Accordingly, the admission of these out-of-court statements at

petitioner's trial implicated his right to confrontation under the Sixth Amendment, and the Court

must apply the standard in *Ohio v. Roberts* to determine whether that right was violated.

Because he was not subject to confrontation at trial, Artberry's statements were admissible under

the Confrontation Clause only if they bore adequate indicia of reliability.  *Roberts*, 448 U.S. at

---

[26] Tucker may have permissibly testified that Artberry appeared scared or nervous when the first and subsequent interviews were elicited.  But any testimony regarding what Artberry asserted had occurred that made him scared, as evidence that he was scared and initially did not disclose all details for that reason, was hearsay when offered in the form of prior out-of-court statements through the testimony of the officer.

66. Such reliability can be inferred without more if the statements fell within a "firmly rooted

hearsay exception." *Id.* Otherwise, the statements should have been excluded, absent a showing

of particularized guarantees of trustworthiness. *Id.*

As an initial matter, the fact that Artberry's statements were admitted pursuant to Art.

801, which characterizes such statements as exemptions from, rather than exceptions to, the

hearsay rule, is of no import to the Court's Confrontation Clause analysis. "Whether such

statements are termed exemptions or exceptions, the same Confrontation Clause principles

apply." *U.S. v. Inadi*, 475 U.S. 387, 399 n.12 (1986). The Court does note again, however, that

Confrontation Clause concerns are rarely implicated at all when evidence is properly admitted

under Rule 801(d)(1)(B) or state counterparts because in such a situation the declarant will

"testif[y] at the trial or hearing and [be] subject to cross-examination concerning the

statement."[27]

Unsurprisingly then, the Court has found no cases in any circuit where a court has

determined FED.R.EV. 801(d)(1)(B) to be a "firmly-rooted" hearsay exception. Not every

exception to the hearsay rule is "firmly-rooted," and a court must deliberate very cautiously

before adding one to the list of such exceptions, "jealously preserv[ing] for the benefit of the

accused" the constitutional safeguard of the Sixth Amendment's confrontation requirement.

*Walker*, 148 F.3d at 525 (citing *U.S. v. Saks*, 964 F.2d 1514 (5th Cir. 1992) and *Glaser v. U.S.*,

---

[27] Confrontation Clause issues with admission of evidence under Rule 801 generally involve the use of Rule 801(d)(2), "Admission by party-opponent," under which the declarant is not required to testify at trial as he is under Rule 801(d)(1). *See, e.g., Inadi*, 475 U.S. at 390 (considering the admission of co-conspirator declarations under FED.R.EVID. 801(d)(2)(E)).

315 U.S. 60, 67 (1942)) (internal quotation omitted).  In that deliberation, a court must evaluate

how "rooted in our jurisprudence," *Walker*, 148 F.3d at 525 (quoting *Saks*, 964 F.2d at 1525), is

the particular hearsay exception.  The Supreme Court has extensively reviewed the history and

jurisprudence of Rule 801(d)(1)(B) in *Tome*, and concluded that the federal rule retained from

the common law that the requirement the statement have been made pre-motive.   It is clear that

any corresponding state rule, like Louisiana Art. 801(D)(1)(b) - at least as it was interpreted by

the courts allowing the admission of Artberry's post-motive statements - that does not retain that

requirement is not "firmly-rooted."[28]

The Court further finds that Artberry's statements bear no particularized guarantees of

trustworthiness that would have allowed their admission at petitioner's trial.  Artberry's

unsworn, testimonial statements were made while in police custody.  Petitioner's claims that

Artberry committed the murder aside, the murder was committed in front of his house after, as he

himself admitted, he arranged for the victim to buy illegal drugs.  The police took him from the

scene and questioned him extensively into the early hours of the morning.  It takes no

imagination to conclude Artberry had an interest in inculpating someone else.  "Reflecting its

underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an

effective means to test adverse evidence, the Clause countenances only hearsay marked with

such trustworthiness that 'there is no material departure from the reason of the general rule.'"

*Roberts*, 448 U.S. at 65 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107 (1934)).  In

_____

[28] The Court need not further consider whether the federal rule or a state rule that retained the common law pre-motive requirement should be considered "firmly-rooted" for Confrontation Clause purposes, because after *Crawford* the reliability of hearsay statements is no longer relevant.

*Crawford*, the Court noted that the fact that "inculpating statements are given in a testimonial setting is ... the trigger that makes the Clause's demands most urgent," 541 U.S. at 65, rejecting the reasoning of courts that found reliability in the very factors that made the statements testimonial. The Court finds nothing in the circumstance surrounding the taking of Artberry's statements that they could be considered sufficiently trustworthy to overcome the rule requiring confrontation of the declarant. The admission of Artberry's unconfronted statements was therefore error in violation of the Confrontation Clause.

### D.  Harmless Error Review

A habeas petitioner is generally not entitled to relief for a constitutional error unless that error caused him harm, but the state bears both the burden of pleading the defense of "harmless error," *see, e.g., Nelson v. Quarterman*, 472 F.3d 287, 331-32 (5th Cir. 2006) (Dennis, J., concurring) (citing *Sanders v. Cotton*, 398 F.3d 572, 578 (7th Cir. 2005); *Lam v. Kelchner*, 304 F.3d 256, 269-70 (3rd Cir. 2002); *and* 2 Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 31.2, at 1512 & n.1 (5th ed. 2005), and of persuading the Court that the error was harmless, *see Fry v. Pliler*, 127 S.Ct. 2321, 2328 n.3 (2007) (noting that the Court has previously held that, when a court is "'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error ... as if it affected the verdict ...'") (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). The court retains the discretion to consider whether the error was harmless even when the issue has been waived, but it should generally do so only if the error's harmlessness is clear from even a cursory review of the record and reversal for further proceedings would amount to no more than a waste of

resources. *Nelson*, 472 F.3d at 332 (Dennis, J., concurring) (citing *Sanders*, 398 F.3d at 582). The state, which did not raise the issue in its response, has waived any argument the error here was harmless, and the error's harmlessness is very much not clear from a review of the record. Indeed, if the issue of harmlessness was properly before the Court, it would find that the error was not harmless.

The standard for determining whether constitutional error is harmless on habeas review is whether it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The erroneously admitted statements were not "merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury." *Brown v. U.S.*, 411 U.S. 223, 231 (1972). Artberry was the only witness at trial who claimed to have witnessed the murder and to be able to identify petitioner as the shooter. Although Artberry's hearing testimony, in which he identified petitioner as the killer, and the other evidence at trial was sufficient to support the verdict, that is not the relevant question. *Kotteakos v. U.S.*, 328 U.S. 750, 765 (1946).[29] This other evidence was not overwhelming. Many damning details, including references to the petitioner as a drug dealer, were contained

---

[29] Another witness, Gelandra Brue, was accused by defense counsel of having conspired with Artberry to commit the murder and then blame petitioner. Her testimony, that Artberry and the victim came to her looking to buy a twenty dollar piece of rock cocaine, State Rec. Vol. 8 at 708, that a man she identified as petitioner, who she had known for a year, pulled up in his car with a passenger, *id.* at 712-13, and that the victim and Artberry left along with petitioner, *id.* at 715, thus can not be considered uncontroverted. When she testified, she admitted to being imprisoned for crimes against nature, *id.* at 706, and to significant drug use, *id.* at 709, and she occasionally supplied Artberry with crack cocaine, *id.* at 742. She was undergoing psychiatric treatment in jail at the time of trial, *id.* at 734, and she admitted that the medication she was taking, Elavil, caused her memory to go in and out. *Id.* at 741. The witness' credibility was further undermined when she had significant difficulty throughout cross-examination remembering things and following defense counsel's questions, and at a bench conference toward the end of her testimony, the judge admitted that "I'm not sure what this lady knows from one minute to the next." *Id.* at 744.

solely in Artberry's statements, and not in his hearing testimony.[30]  Most damning of all was his

assertion that petitioner had shot the victim over what amounted to nineteen dollars.  Tucker's

testimony regarding his "theory," that the victim had intended to pay in full and was frantically

searching for his twenty-dollar bill when petitioner shot him in cold blood, was founded

---

[30] In its Statement of Facts in its opinion on direct review, the Louisiana Fifth Circuit states that a tape-recording of Det. Tucker's interview of Ms. Brue, conducted immediately after she identified a photograph of the petitioner, was "played at trial." *Jones*, 841 So.2d at 971-72.  This does not appear to be accurate.  After the state moved to introduce Ms. Brue's taped statement during Det. Tucker's testimony at trial, defense counsel objected at a bench conference.  State Rec. Vol. 9 at 813-14; Tr. trans. at 188-89.  The prosecution argued that the statement was admissible pursuant to the same article, 801(D)(1)(b), to rebut the defendant's claims that Ms. Brue was "coming in here and making all of this up to frame this man."  *Id*. at 815-16; Tr. trans. at 190-91.  The judge found that the article did not apply in this particular case, and sustained the objection "in that it's hearsay and does not comport with 801, as articulated."  *Id*. at 817; Tr. trans. at 192.  Defense counsel then initially indicated that he was not certain he did not want Ms. Brue's statement admitted, noting the "big distinction" between admitting Ms. Brue's statement under the article, because she had testified live at trial and was subject to cross-examination, and admitting the statements of Artberry, who had never testified or been cross-examined concerning the statements.  *Id*. at 817-18; Tr. trans. at 192-93.  After a recess, defense counsel renewed and confirmed his objection to the admissibility of the statements, and the court heard additional argument about the applicability of Art. 801(D)(1)(b).  The judge noted that Ms. Brue, rather than Det. Tucker, "might be the proper person to use to introduce the statement" and that he might later reconsider the issue.  He then ruled, however, that at that particular time, given the arguments of counsel, "the statement is not coming in."  *Id*. at 822; Tr. trans. at 197.  Moments later the prosecution, although recognizing that "obviously we're not allowed to publish [the tape-recorded statement of transcript of Det. Tucker's interview of Ms. Brue] to the jury," moved at another bench conference to offer them into evidence without publication.  *Id*. at 825; Tr. trans. at 200.  After repeating that he was not allowing her statement into evidence, and eliciting defense counsel's stipulation that Det. Tucker took the statements, the judge admitted the statement into the record for "[r]ecord keeping only; not to be published."  *Id*. at 825-26; Tr. trans. at 200-201.  Despite the judge's suggestion that he might reconsider his ruling at a later point if Ms. Brue was recalled as a witness, she never was (Det. Tucker was the last witness), and the issue was not re-raised.  At no point does the record reflect that the recording of Ms. Brue's statement was played for the jury.

The record elsewhere confirms that Ms. Brue's statement was not admitted into evidence.  The exhibit index for the Louisiana Fifth Circuit record, included in the first several pages of State Rec. Vol. 9, indicates that State exhibits 44 and 45, a "microcassette tape" and "transcript of S-44," respectively, were admitted at page 826 of the record for "record purposes."  In addition, page three of the trial transcript lists the exhibits admitted into evidence; S-44 and S-45 are not included.  State Rec. Vol. 8 at 628; Tr. trans. at 3.

Because a copy of the transcript of this interview is not present in the state record, it is difficult to assess the scope and potential impact of Ms. Brue's assertions to Det. Tucker.  The Court need not and does not rely on the absence of this evidence in its assessment of the harmlessness of the admission of Artberry's statements.  But if, as it appears from the record, the jury was not presented with her assertion, as described by the Louisiana Fifth Circuit, that "Terrence sold drugs in her driveway on a daily basis," this fact would further undermine any argument that Artberry's statements were merely cumulative of other evidence "properly before the jury," and would increase the harm caused by his statements.  (At the bench conference regarding the admissibility of Ms. Brue's statement, defense counsel quoted it as including the assertion that "[h]e comes over every day; he parks in the driveway and he sells his drugs, in arguing that the statement was "certainly highly prejudicial."  *Id*. at 820-21; Tr. trans. at 195-96.)

necessarily on the inadmissible statements. The prosecutor clearly considered this assertion key

to its case, and highlighted it in considered fashion through Tucker's testimony. The "crucial

thing is the thing done wrong on the minds of other men," that is, the jury, "in the total setting."

*Id.* at 764. The focus on Artberry's assertion regarding the twenty-dollar bill alone would lead

the Court to conclude the introduction of his uncontested statements[31] had a "substantial and

injurious effect or influence in determining the jury's verdict" such that the error was not

harmless.

Accordingly, the Court finds that the admission of Artberry's unconfronted statements at

trial violated petitioner's Sixth Amendment right to confront witnesses against him. The

Louisiana Fifth Circuit, whose opinion was affirmed without reasons by the state supreme court,

does not appear to have fully considered United States Supreme Court precedent in *Street* and

*Roberts* when it affirmed the admission of the statements, and its decision was an unreasonable

application of clearly established federal law.


**V. CONCLUSION**

Having considered the petition, the record, and the applicable law, the Court has

determined that the petitioner has demonstrated his state conviction and sentence present

---

[31] As noted above in note 9, the Court could not locate a copy of the third statement in the record presented
to this Court. The brief description of this statement by the Louisiana Fifth Circuit suggests that it was further
prejudicial in a way not cumulative of Artberry's hearing testimony: "[Artberry] said he knew Terrence as a drug
dealer." *Jones*, 841 So.2d at 971. However, the Court need not and does not consider the third statement in order to
conclude that petitioner's right to confrontation was violated, and that violation was not harmless.

grounds for the relief requested.  The petition of TERRANCE JONES for writ of habeas corpus

under 28 U.S.C. § 2254 is GRANTED.  Accordingly,

IT IS ORDERED that the conviction and sentence of TERRANCE JONES be and hereby

are set aside;

 IT IS FURTHER ORDERED that the state either retry petitioner within 120 days of this

order or dismiss the charges.  The state shall notify the defense and the Court of its intention

within 30 days of this ruling.  Judgment will be entered accordingly.

IT IS FURTHER ORDERED that petitioner's motions 1) for an evidentiary hearing and

oral arguments (15); 2) to dismiss hearsay testimony (16); and 3) for exclusion of relevant

evidence on the grounds of prejudice, confusion, or waste of time (17) are hereby DISMISSED

AS MOOT.

New Orleans, Louisiana, this 9th day of February, 2009.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE